**UNITED INDEPENDENT FLIGHT OFFICERS, INC., et al., Plaintiffs-Appellants,**

**v.**

**UNITED AIR LINES, INC., & Air Line Pilots Association, International, Defendants-Appellees.**

**No. 83–2572.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1984.

Decided Jan. 17, 1985.

As Amended Jan. 29, 1985.

Raymond C. Fay, Haley, Bader & Potts, Chicago, Ill., for plaintiffs-appellants.

Columbus R. Gangemi, Jr., Winston & Strawn, Chicago, Ill., Michael E. Abram, Cohen, Weiss & Simon, New York City, for defendants-appellees.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is another in a series of appeals arising out of various disputes between United Independent Flight Officers, Inc. ("UIFO"), United Air Lines, Inc. ("Unit-ed"), and the Air Line Pilots Association, International ("ALPA"). Plaintiff UIFO is a corporation whose members include current and former United pilots. ("Pilots" refers collectively to all flight deck personnel—pilots, co-pilots and navigators.) Defendant United is an airline having its principal place of business within the Northern District of Illinois. Defendant ALPA is the collective bargaining representative of the pilots of United and of members of UIFO. The individual plaintiffs are both members of UIFO and members or former members of ALPA.

This is a challenge by a group of retired United pilots to a collective bargaining agreement which retroactively amended and improved certain benefit plans available to United pilots including the plaintiffs. The complaint alleges that United and ALPA unlawfully failed to provide among the pension distribution options one which would permit pilots who retired between February 1, 1981, and December 31, 1981, to receive a lump sum distribution with the same tax consequences as pilots who retired on or after January 1, 1982. The plaintiffs complain in Count I that United and ALPA have breached their fiduciary duties under §§ 404 and 405 of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified at 29 U.S.C. §§ 1104, 1105. They also allege, as Count II, that ALPA breached its duty of fair representation implied under the Railway Labor Act (the "RLA"), and that United was a party to that breach. In Count III they claim that they have also been injured by breaches of certain contracts between United and ALPA. Finally, the plaintiffs allege as Count IV of their complaint that the defendants are estopped to deny them the opportunity for a lump sum rollover or its financial equivalent.

The district court dismissed Count I for failure to state a claim for breach of fiduciary duty under ERISA, and Count II was dismissed as barred by the statute of limitations. The trial court went on to dismiss Counts III and IV without prejudice, since they are state law claims. We affirm.

## I

This is an appeal of a grant of a motion under Rule 12(b)(6), FED.R.CIV.P., to dismiss for failure to state a claim upon which relief may be granted. For present purposes, we, of course, take the facts alleged by plaintiff to be true. *Kugler v. Helfant,* 421 U.S. 117, 125, 95 S.Ct. 1524, 1531, 44 L.Ed.2d 15 (1975); *Haroco, Inc. v. American National Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984), *cert. granted,* — U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985).

The 1979 agreement between United and ALPA governing the terms and conditions of employment of United pilots, which was set to expire in early 1981, provided two benefit plans. One was the United Air Lines, Inc., Pilots' Fixed Benefit Retirement Income Plan (the "A" Plan), the other the United Air Lines, Inc., Pilots' Variable Benefit Retirement Income Plan (the "B" Plan). On March 20, 1981, negotiations for a successor labor agreement had not been completed, so United and ALPA agreed to extend the 1979 agreement while incorporating certain immediate wage improvements, and agreed to continue negotiations. United and ALPA also agreed that any improvements to the United pilot pension or disability plans resulting from these continuing negotiations would be made retroactive with respect to pilot participants to February 1, 1981. Negotiations continued and the new basic agreement was signed on August 14, 1981 (the "1981 Pilot Agree-

ment"). However, agreement had not been reached on any pension improvements, so the parties agreed to continue negotiating with the understanding that improvements would be retroactive. In addition, the parties agreed that, if no agreement could be reached on the pension issues by August 1, 1982, the 1981 Pilot Agreement would be subject to reopening. Continued negotiations were successful, and on June 24, 1982, a "Supplemental Agreement" was signed. The Supplemental Agreement modified and improved both the A and B Plans, but only the changes to the B Plan are here in dispute.[1]

Under the Supplemental Agreement the United Air Lines, Inc., Pilots' Variable Benefit Retirement Income Plan (the B Plan) was converted to the United Air Lines, Inc., Directed Account Retirement Income Plan (the "Directed Account Plan"). This conversion was retroactive to an effective date of February 1, 1981. Under the terms of the Directed Account Plan each pilot could choose among a variety of investment funds in which to place his or her retirement account assets. In addition, the conversion supplemented the methods by which a retired pilot could receive his or her benefits. The normal form of receipt of benefit under the B Plan had been by a single life annuity. The Directed Account Plan provided a choice of any one of four alternate payment methods.[2]

---

**1.** The Fixed Benefit Retirement Plan (A Plan) involves a formula based on multiplying the product of "final average earnings" and years of participation by a "multiplier." The 1982 improvements included increasing the multiplier from 1.30% to 1.39% and basing the final average earnings calculation on the three consecutive years with the highest income out of the pilot's final ten years rather than on five such consecutive years. The effect of these changes was to increase the benefit payable to the pilot. However, since the change increased the value of a year of participation in the plan, it also increased the absolute, though not the relative, difference in retirement benefits between pilots who had participated in the plan for different periods of time. This difference spawned another dispute between UIFO and many of its members, and ALPA and United. That dispute is the subject of separate litigation, an appeal from which was heard by this panel immediate-

ly after oral argument of this appeal. *United Independent Flight Officers, Inc. v. United Air Lines, Inc.,* 756 F.2d 1274 (7th Cir.1985).

**2.** The pertinent provision of the Directed Account Plan is as follows:

e. Effective February 1, 1981, a pilot (or his survivor, if applicable) will be permitted, subject to the qualified joint and survivor annuity requirements of ERISA, to elect to receive his or her vested Directed Account Plan benefits in one of the following forms in lieu of the normal form of benefit payment, i.e., single life annuity, at the time of termination of employment for any reason:

(i) a lump sum distribution of all or any portion of the pilot's entire interest in the Directed Account Plan, or

All of the mentioned improvements to, and changes in, the Directed Account Plan were, as plaintiffs concede, implemented retroactively. Pilots who retired on or after February 1, 1981, received the increased benefits under the A Plan and were entitled to transfer their Plan B assets into the Directed Account Plan. Further, they were allowed to elect distribution under the new options, and in particular could get a lump sum distribution of the remainder of their account assets pursuant to option (i). *See supra* n. 2. We shall also take it as true for purposes of this appeal that the lump sum option was "negotiated specifically for the purpose of a rollover into an IRA," District Court Memorandum Opinion and Order 7, UIFO App. 7; UIFO Br. 4 n. 1, though this is not alleged in the complaint.

The individual named plaintiffs (and those class members they seek to represent) are pilots who reached retirement age in 1981, whose normal retirement date was February 1st or later in 1981 and who received periodic pension benefits during 1981. This last fact is crucial to their difficulty, for receipt in that year may preclude *tax-free* rollover of a lump sum distribution (if that were elected) into an Individual Retirement Account (an "IRA"). It is for the value of the putatively lost tax-free status of the rollover that plaintiffs sue.

The problems of tax treatment involved in the rollover of a pension distribution into an IRA are somewhat complex. A lump sum distribution is an optional form of benefit payment which a pension plan need not provide in order to qualify for tax

exempt status under § 501(a) of the Code. *See* I.R.C. § 401(a)(9). If available under a plan and elected by a plan participant, a lump sum distribution may be used for any purpose. Under usual circumstances the entire distribution is taxed to the recipient in the taxable year of distribution. An attractive way to defer the tax is to roll the distribution over into an IRA. In that case, since receipt of any money from the IRA may be deferred until age 70½, the tax on the plan distribution may be similarly deferred. But, in order to defer taxation of the distribution by use of an IRA rollover, the recipient must, in general, receive the distribution within a single taxable year. I.R.C. § 402(a)(5). However, the Internal Revenue Service (the "IRS") has made exceptions to this general rule in a number of situations not unlike that of the instant case. United Br. 9 n. 12 (collecting Private Letter Rulings).

Prior to the 1982 Supplemental Agreement neither the A Plan nor the B Plan provided as an optional form of distribution a lump sum payment. Each plan provided for monthly payment of benefits, starting the month after retirement. The Supplemental Agreement provided for optional lump sum distribution from the Directed Account Plan (the successor to the B Plan).[3] However, by the time the Supplemental Agreement was concluded pilots who had retired in 1981 had received distributions from the B Plan in both 1981 and 1982, and, under the general rule, would presumably be ineligible for a tax-deferring rollover into an IRA of the lump sum distribution of the remainder of their interest.

(ii) a fixed rate annuity based on group rates purchased from an insurer selected by the Company, or

(iii) a variable rate annuity based on group rates purchased from an insurer selected by the Company, or

(iv) a variable rate annuity based on group rates purchased from an insurer selected by the Company, with the variability based on the performance of a money market fund. UIFO App. 16. The annuity payments were available in various forms such as ten-year certain, contingent annuitant and life annuity. In addition the Medical Plan was modified so as to provide coverage to pilots after retirement.

**3.** Payment by lump sum distribution was not added as an option under the A Plan (now the Defined Benefit Plan), which continued to be paid monthly. The monthly payments to plaintiffs from the Defined Benefit Plan are not relevant to the plaintiffs tax status because of § 402(a)(6)(E) of the Code, added in 1981 by Pub.L. 96–608, 94 Stat. 3551, which allows elective rollover of a lump sum distribution from a money purchase plan (here the Directed Account Plan) even though the participant continues to receive monthly benefit payments from a defined benefit plan.

In August, 1982, United applied to the IRS for a ruling allowing the 1981 retirees to roll their remaining B Plan assets over into an IRA on a tax deferred basis. United Br. 11. During the months following conclusion of the Supplemental Agreement the United Pension Programs Department sent several letters and information packets to the 1981 retirees informing them of the changes, including those to the options under the Directed Account Plan. The letters also requested election between the prior plans and the new plans and, if the new plans were elected, a choice among the methods of payment available under the Directed Account Plan. The letters also informed retirees of the expected IRS position, and, later, of the actual ruling[4] and advised against a lump sum distribution for IRA rollover unless the retiree "wish[ed] to try the IRA route and pursue the matter through the courts." UIFO App. 19.

No plaintiff has alleged that he was prevented by United or ALPA from selecting any one of the four benefit payment options, that he attempted a lump sum tax-free rollover into an IRA, that he has had such an attempt disallowed by the IRS or that he has tested the IRS position in the courts. Instead, the gist of the plaintiffs complaint is that, *if* they had selected lump sum distribution, and *if* they had rolled it over into an IRA, the IRS had said that it would deny their eligibility for tax deferral on the distribution because they had received periodic payments in both 1981 and 1982. On this basis plaintiffs contend United and ALPA are liable.

**4.** Record on Appeal, Item 22, Ex. A.

**5.** The events alleged in the complaint which plausibly could be the basis of the breach all antedate the Supplemental Agreement, Complaint ¶¶ 6–11, and the contentions in UIFO's brief involve similar events, UIFO Br. 5–6. However, UIFO also argues that, although the "plaintiffs ... seek to enforce promises made in collective bargaining," *id.* 12, "the reasonableness of the structure of the new benefit improvements is not at issue," *id.,* because "the claim for breach of fiduciary duty under ERISA ... concern[s] not only the negotiations leading up to the signing of the 1982 supplemental agreement, but also the subsequent administra-

## II

The first count of UIFO's complaint, based on breach of fiduciary duty under sections 404 and 405 of ERISA, 29 U.S.C. §§ 1104, 1105, raises the question, according to UIFO, "whether defendants, as fiduciaries under ERISA, should be held responsible for placing plaintiffs in the position of losing the opportunity for the valuable IRA rollover treatment." UIFO Br. 5. UIFO alleges, in essence, that ALPA and United breached a fiduciary duty in negotiating and implementing the lump sum distribution option.[5] Neither ALPA nor United could have breached such a duty, however, unless it had such a duty. And it could not have such a duty unless it was a fiduciary under the terms of ERISA.[6] The duties of a fiduciary are set out in section 404 of ERISA but section 3(21) of ERISA actually defines a fiduciary. In relevant part, section 3(21) provides:

(A) Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administra-

tion and implementation of the new plan structure during the final months of 1982," *id.* at 14. Because of our disposition of the issue of defendants' fiduciary status, we do not believe this variation in the characterization of UIFO's claim is important.

**6.** UIFO argues that its allegations that defendants are fiduciaries must be taken as true on a motion to dismiss, citing *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This is clearly incorrect, for the question whether a union is a fiduciary within the meaning of ERISA while negotiating benefits in a pension plan is a question of law not of fact.

tion of such plan. Such term includes any person designated under Section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21).[7]

There is no contention that either ALPA or United rendered investment advice for compensation nor, since the plans in question are employer-administered, that ALPA has any discretionary authority or responsibility in administering the plan. Therefore ALPA could only be a fiduciary to the extent it exercises any discretionary authority or control respecting management of the plan or over management or disposition of its assets. Similarly, United could only be a fiduciary to the extent it exercises any discretionary authority or control respecting management of the plan or over management or disposition of its assets, or has discretionary authority or responsibility in the administration of the plan. ERISA § 3(21)(A); 29 U.S.C. § 1002(21)(A); 29 CFR § 2509.75–8; *Thornton v. Evans*, 692 F.2d 1064, 1077 (7th Cir.1983); *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254, 259 (7th Cir.1983).

ALPA's status as a fiduciary, based on authority or control over the plan or management or disposition of its assets, cannot extend beyond the signing of the Supplemental Agreement. *See Rosen v. Hotel & Restaurant Employees Union, Local 274*, 637 F.2d 592 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Nor did ALPA have control over the management or disposition of the plan assets prior to that time.[8] Therefore ALPA's fiduciary status could only rest on its authority or control over the plan through collective bargaining with United, in particular through the negotiations leading up to the 1982 Supplemental Agreement.

The process of negotiation is one of "compromise and economic pressure," *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336, 101 S.Ct. 2789, 2797, 69 L.Ed.2d 672 (1981). The union and employer "attempt to reach an agreement by negotiation, and, failing agreement, are free to settle their differences by resort to such economic weapons as strikes and lockouts, without any compulsion to reach agreement." *Id.* Nor is their any compulsion to reach a particular agreement. Of course the substantive terms of the agreement must comply with federal law, *UMWA Health & Retirement Funds v. Robinson*, 455 U.S. 562, 575, 102 S.Ct. 1226, 1234, 71 L.Ed.2d 419 (1982), and the bargaining process must comply with the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* In the process the union must fairly represent the interests of all employees in the bargaining unit. *Robinson*, 455 U.S. at 576, 102 S.Ct. at 1234. But just as the union may compromise with the employer, it must also mediate among the various interests of its employees.

A major responsibility of negotiators is to weigh the relative advantages and disadvantages of differing proposals. ... The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. ... Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in servicing the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

---

7. Subparagraph (B) deals with the fiduciary status of registered investment companies. Section 1105(c)(1)(B) deals with persons appointed by named fiduciaries to carry out fiduciary responsibilities.

8. UIFO does not in this case argue that United's potential contribution to the benefit plan, disposition of which ALPA arguably has control over through its adversary relation to United in the collective bargaining process, is a plan asset.

*Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). This discretion to mediate and compromise, so long as it is pursued in good faith and with honesty, certainly extends to bargaining over the terms of employee benefit plans. *Robinson,* 455 U.S. at 573–76, 102 S.Ct. at 1232–34.

The duties imposed on a fiduciary are inconsistent with the demands of negotiation and collective bargaining. *See Amax Coal,* 453 U.S. at 336, 101 S.Ct. at 2797. A fiduciary must act solely to benefit participants in and beneficiaries of the plan. Negotiators engaged in collective bargaining, however, may "make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented." *Huffman,* 345 U.S. at 338, 73 S.Ct. at 686. "A fiduciary cannot contend 'that, although he had conflicting interests, he served his masters equally well ...'[,]'" *Amax Coal,* 453 U.S. at 330, 101 S.Ct. at 2794 (quoting *Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 269, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941)), although pursuit of this mixed loyalty is precisely what a union negotiator must engage in.

■ To impose fiduciary status on union negotiators would unreasonably cramp legitimate negotiations, presumably forcing negotiators to arbitrarily favor a single group of employees. The concept of negotiator as fiduciary is also wholly inconsistent with the very fiduciary provisions of ERISA, which were designed to prevent a fiduciary " 'from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.' " *Amax Coal,* 453 U.S. at 334, 101 S.Ct. at 2796 (quoting H.R.CONF.REP. No. 1280, 93d Cong., 2d Sess. 309, *reprinted in* 1974 U.S. CODE CONG. & AD.NEWS 4639, 5038, 5089). We conclude that a union is not a fiduciary while, or merely because, it is negotiating the terms and conditions of future pension benefits, at least where these benefits are not protected under ERISA's vesting and

non-forfeitability provisions. *Sutton v. Weirton Steel Division of National Steel Corp.,* 567 F.Supp. 1184, 1201 (N.D.W.Va.), *aff'd,* 724 F.2d 406 (4th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). "While the union does owe a duty of fair representation to its members, ... it does not control, nor is it in a position to oversee, the employer's contributions to the fund." *Rosen v. Hotel & Restaurant Employees Union, Local 274,* 637 F.2d 592, 599 n. 10 (3d Cir.), *cert. denied,* 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981).

■ We turn now to United's status as a fiduciary. With respect to United's status as a fiduciary while negotiating the 1982 Supplemental Agreement, our reasoning with respect to ALPA applies with equal force. The fact that United was, at the same time, the administrator of the Plan does not alter our conclusion. The administrator of a plan is a fiduciary only to the extent he is engaged in administration. The tasks of administration do not extend to negotiating the terms of the governing collective bargaining agreement. *NLRB v. Amax Coal Co.,* 453 U.S. 322, 336–38, 101 S.Ct. 2789, 2797–99, 69 L.Ed.2d 672 (1981). We find persuasive the reasoning of *Sutton v. Weirton Steel Division of National Steel Corp.,* 567 F.Supp. 1184, 1201 (N.D.W.Va.), *aff'd* 724 F.2d 406 (4th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984), where the court said:

> [N]egotiations that affect the terms and conditions of future pension benefits (at least those that are not protected by ERISA's vesting and non-forfeitability provisions), do not implicate fiduciary duties as to the pension fund. Such negotiations are distinct from actually administering a plan and conducting transactions affecting the monies and property of the plan's fund. In other words, the mere fact that a company has named itself as pension plan administrator or trustee does not restrict it from pursuing reasonable business behavior in negotiations concerning pension benefits not

otherwise affected by the requirements of ERISA. When the terms of the pension agreement are negotiated by a labor organization and the employer and ultimately controlled by a collectively bargained agreement, as here, the distinction between administering the pension program (under a fiduciary duty) and creating or amending the program through negotiations is even more clear.

*Sutton,* 567 F.Supp. at 1201 (citations and footnote omitted). We conclude that neither United nor ALPA was a fiduciary as they negotiated the benefits changes incorporated into the 1982 Supplemental Agreement.

This does not end our inquiry, however, for United is administrator of the Plans, and hence a fiduciary to that extent. But as administrator United could not have breached any fiduciary duties with respect to the lump sum distribution option, whether or not the option was negotiated for the purpose of tax-free rollover into an IRA, until that option was included in the Plan at the conclusion of negotiations. No act of United alleged by UIFO in the period from the signing of the Supplemental Agreement until the plaintiffs elected some other form of payment on November 10, 1982, could conceivably be a breach of fiduciary duty with respect to the tax-free status of the lump sum distribution. United kept plaintiffs informed through a series of letters of the options they had and the probable consequences of each. United applied to the IRS for a ruling allowing plaintiffs tax-free rollover of the lump sum distribution, and when that was denied, *see* Record on Appeal, Item 22, Ex. A, informed plaintiffs of the result. United also informed plaintiffs of their right to elect the lump sum distribution and challenge the IRS position through the courts.[9] The plaintiffs chose not to do so. We believe United did not breach any fiduciary duty in administering the Plans in accordance with the terms established in the Supplemental

Agreement. *See Robinson,* 455 U.S. at 574, 102 S.Ct. at 1233.

We conclude that there is no set of facts which UIFO can prove to support its claim that United and ALPA have breached their fiduciary duties under ERISA causing plaintiffs to lose tax-free rollover treatment of the lump sum distribution. Count I of the complaint was properly dismissed.

### III

The second issue raised by UIFO is the dismissal of Count II, which alleges that ALPA breached its duty of fair representation ("DFR") implied under the Railway Labor Act, and that United was a party to that breach. The district court dismissed the count as barred by the six month statute of limitations contained in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b). On appeal, UIFO argues that the correct statute of limitations is either § 413 of ERISA, 29 U.S.C. § 1113, *see infra* n. 12, or the ten year Illinois state statute of limitations for actions on a written contract, ILL.REV.STAT., ch. 110, § 13–206. UIFO further argues that if we hold the six month section 10(b) limit applicable, UIFO's claim is, on the facts before us, timely filed.

The Supreme Court has recently considered the appropriate statute of limitations for a DFR claim under the Labor-Management Relations Act. *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). We find that *DelCostello,* considered in conjunction with *Ranieri v. United Transportation Union,* 743 F.2d 598 (7th Cir.1984) and *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) require the application of the section 10(b) six month limitations period.

Section 301 of the LMRA, 29 U.S.C. § 185, gives an employee a cause of action against his or her employer for unfair labor practices. The employee also has a cause of action against his or her union for

---

**9.** Since United would not be a taxpayer with respect to the lump sum distribution, it could not itself challenge the IRS ruling in the courts.

breach of the union's duty of fair representation. Both the union's duty and the employee's cause of action are "implied under the scheme of the National Labor Relations Act," *DelCostello,* 103 S.Ct. at 2290; *Ranieri,* 743 F.2d at 600. A similar duty and cause of action are implied under the Railway Labor Act, *Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 204, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944); *Ranieri,* 743 F.2d at 600. In *DelCostello,* the Supreme Court considered which statute of limitations should apply to a suit by an employee against an employer under § 301 of the LMRA joined with one against the union for breach of its DFR under the NLRA,[10] and held that the six month limitation of section 10(b) of the NLRA applied to both aspects of the hybrid DFR/301 claim. *DelCostello,* 103 S.Ct. at 2293–94. This court has followed *DelCostello. See Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984); *Storck v. International Brotherhood of Teamsters, Local Union No. 600,* 712 F.2d 1194 (7th Cir.1983).

■ Three reasons have been advanced for not following *DelCostello* in this case. First, the DFR against the union arises here under the RLA not the LMRA, as was the case in *DelCostello.* Second, the hybrid action in *DelCostello* arose from a grievance, whereas here the claimed breach of the DFR took place during negotiations. Finally, UIFO is not suing United directly under section 301, which it cannot do since

section 301 does not apply to air carriers or other employers subject to the RLA, 29 U.S.C. § 152(2) & (3), but rather as a party to ALPA's DFR breach. Thus the action is not a true hybrid action. Two of these considerations are disposed of by our recent decision in *Ranieri v. United Transportation Union,* 743 F.2d 598, 600 (7th Cir.1984), where we held, following *DelCostello,* that the six month section 10(b) limitation applied to a Railway Labor Act DFR claim by an employee against his union. Ranieri filed suit against the union but not against the employer. *Id.,* at 599. This court has consistently applied the section 10(b) limit to the DFR claim when it is linked with the section 301 suit against the employer, *Metz,* 715 F.2d at 302 n. 4; *Hall,* 696 F.2d at 498, and we see no reason not to follow *Ranieri* in applying the same rule when the DFR claim arises under the RLA and so is not associated with a section 301 claim against the employer.[11]

■ Nor need the fact that this claim arose from the negotiating process instead of the grievance procedure deter us from applying *DelCostello,* for the reasoning of the Supreme Court applies at least as forcefully here. *Costanzo v. United Parcel Service, Inc.,* 573 F.Supp. 1118 (E.D.N.Y.1983). Although not reaching the question whether all DFR breaches by a union were unfair labor practices (the position taken by the NLRB and, apparently, by this circuit, *Metz,* 715 F.2d at 302 n. 4; *Hall,* 696 F.2d at 498), the Court in *DelCostello* conceded that "the family resem-

---

**10.** The appropriate statute of limitations for section 301–DFR claims has been the subject of dispute because they are not expressly governed by any federal statute of limitations. The Supreme Court has "generally concluded that Congress intended that the courts apply the most analogous statute of limitations under state law." *DelCostello,* 103 S.Ct. at 2287 (footnote omitted). Until *DelCostello* federal courts generally applied state statutes of limitations to these hybrid federal claims. However, this Circuit applied to the DFR portion of the claim, even before *DelCostello,* the six month section 10(b) limitation period for unfair labor practice complaints to the NLRB, on the theory that a union's breach of its DFR is an unfair labor practice. *Metz v. Tootsie Roll Industries, Inc.,* 715 F.2d 299, 302 n. 4 (7th Cir.1983), *cert. de-*

nied, —— U.S. ——, 104 S.Ct. 976, 79 L.Ed.2d 214 (1984). *See, e.g., Hall v. Printing and Graphic Arts Union, Local No. 3,* 696 F.2d 494, 498 (7th Cir.1982) (pre-*DelCostello* application of § 10(b) to DFR claim).

**11.** Four other circuits apply the section 10(b) limit to RLA DFRs. *Barnett v. United Air Lines, Inc.,* 738 F.2d 358 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 594, 83 L.Ed.2d 703 (1984); *Welyczko v. U.S. Air, Inc.,* 733 F.2d 239 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984); *Sisco v. Consolidated Rail Corp.,* 732 F.2d 1188 (3d Cir.1984); *Hunt v. Missouri Pacific R.R.,* 729 F.2d 578 (8th Cir. 1984).

blance [between DFR breaches and unfair labor practices] is undeniable, and indeed there is a substantial overlap." 103 S.Ct. at 2293. The Court relied on the reasoning of Justice Stewart's concurrence in *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 70–71, 101 S.Ct. 1559, 1567–68, 67 L.Ed.2d 732 (1981), and concluded that in establishing the six month 10(b) limit

> Congress established a limitations period attuned to what it viewed as the proper balance between the national interests in stable bargaining relationships and finality of private settlements, and an employee's interest in setting aside what he views as an unjust settlement under the collective bargaining system.

*DelCostello*, 103 S.Ct. at 2294 (quoting Stewart, J., concurring in *Mitchell*, 451 U.S. at 70, 101 S.Ct. at 1568). This "clear congressional indication of the proper balance," *id.*, coupled with the need for uniformity among procedures followed for similar claims, led the Court to adopt the six month 10(b) limit. In addition, the interests involved in a challenge to actions taken under a collective bargaining agreement, as in typical DFR/301 claims, are present in a similar way in challenges to the process of collective bargaining which

leads to such an agreement. *Costanzo*, 573 F.Supp. at 1120. Therefore, the six month limit of section 10(b) should be applied equally to disputes arising from the process of negotiation and to those arising from actions under the agreement resulting from the negotiations.

UIFO argues that our decision in *Jenkins v. Local 705 International Brotherhood of Teamsters Pension Plan*, 713 F.2d 247 (7th Cir.1983), requires that we apply the Illinois statute of limitations for contract actions to its DFR claim. The plaintiff in *Jenkins* brought an action pursuant to sections 502(a)(1)(B) & (e) of ERISA, 29 U.S.C. § 1132(a)(1)(B) & (e), to clarify the terms of an employee benefit plan and obtain benefits thereunder. The question on appeal was which state statute of limitations governed such a claim. ERISA, like section 301 of the LMRA, does not contain a general statute of limitations applicable to civil actions.[12] *Jenkins*, 713 F.2d at 251. Relying at least in part on a parallel between section 502 ERISA actions and section 301 LMRA actions which is suggested by the legislative history of ERISA,[13] we held that the timeliness of section 502 actions was "to be determined, 'as a matter

---

**12.** Actions for breach of fiduciary duty against ERISA fiduciaries are governed by an explicit statute of limitations, section 413 of ERISA, 29 U.S.C. § 1113, which provides:

> *Limitation of actions.*
> (a) No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—
> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
> (2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under the subchapter;
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

**13.** At the time of the enactment of ERISA a joint explanatory statement was issued and made a part of the legislative history of the Act. In part, that statement provided:

> Under the conference agreement, civil actions may be brought by a participant or beneficiary to recover benefits due under the plan, to clarify rights to receive future benefits under the plan, and for relief from breach of fiduciary responsibility.... However, with respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions, they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction. All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1947.

H.R.Conf.Rep. No. 1280, Joint Explanatory Statement of the Committee of Conference, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5038, 5107. This passage was quoted in *Jenkins*, 713 F.2d at 250, where particular emphasis was placed on its last sentence.

of federal law, by reference to the appropriate state statute of limitations,' " 713 F.2d at 250 (*quoting Mitchell*, 451 U.S. at 60, 101 S.Ct. at 1562 (1981)). 713 F.2d at 251. The most appropriate state statute of limitations was to be determined by "examin[ing] the underlying nature of the federal claim as well as the federal policies involved." *Id.* The plaintiff in *Jenkins* did not challenge the terms, conditions or implementation of the collective bargaining agreement, but tried to recover benefits allegedly due under the benefit plan, and to clarify and enforce rights under the terms of the plan. We concluded that the claims were "creatures of contract law and not of labor law," *id.* at 252, and that the most analogous Illinois statute of limitations was the ten year one for written contracts, ILL. REV.STAT., ch. 110, § 13–206, 713 F.2d at 253. We rejected the six month limit of section 10(b) as inapplicable because the claim was a contract action not one based on labor law.

*Jenkins* is therefore distinguishable. It was a contract action. Here, however, Count II of UIFO's complaint is a claim against its union for breach of its duty of fair representation. Such a claim is a creature of labor law, not of contract law.

■ UIFO's final argument is that its ERISA claim (Count I) and its DFR claim (Count II) arose from a common nucleus of operative facts, and hence are "inextricably intertwined." There is no dispute that its ERISA claim is not time barred by the ERISA statute of limitations for actions for breach of fiduciary duty, section 413 of ERISA, 29 U.S.C. § 1113. These propositions allegedly mandate the application of the ERISA statute of limitations for breach of fiduciary duty to its DFR claim against the union and the consequent finding that the DFR claim is not time barred. We considered a similar argument in *Metz, supra.*

Appellant also argues that the allegation of a cause of action based upon state law requires application of the five year statute of limitations period which Illinois law provides for the state law claim

to all claims in the case. This contention has no merit. Appellant forgets that the complaint alleged two independent claims. One claim was a federal law claim which was a hybrid § 301 fair representation claim. As discussed above, the section 10(b) limitation period applies to this claim. The other claim was a pendant state law claim. The reliance upon the state statute of limitations for this second claim does not affect the appropriate statute of limitations to be applied to the [hybrid] federal claim. 715 F.2d at 303 n. 6. The fact that the non-DFR/301 claim is a federal ERISA fiduciary duty claim instead of a pendent state law claim is immaterial for the present purpose.

On the other hand, the Third Circuit has recently accepted a similar argument for applying the ERISA section 413 limitation periods to a hybrid DFR/301 claim. *Adams v. Gould, Inc.,* 739 F.2d 858 (3d Cir. 1984). The dispute in *Adams* concerned an alleged failure by the now defunct employer to fund a pension plan at a level sufficient to provide benefits for future, but vested beneficiaries. The Third Circuit argued that both speed and finality, the most important considerations in most hybrid DFR/301 suits which concern the day-to-day relationship between labor and management, are less relevant where the dispute involves the funding of a pension plan.

> [T]he immediate effect of the dispute on the day-to-day labor-management relationship is slight. The funding issue involves the immediate interests only of retirees currently receiving benefits.... The long-term interests of current employees are at stake, but delay in resolving disputes concerning those interests does not disrupt labor management relations. Nor does the delay itself prejudice the interest of the employees.

739 F.2d at 867 (footnote omitted). The court reasoned that since the logic of *Del-Costello* was not compelling under these circumstances, that decision did not preclude the use of a federal statutory period other than section 10(b). The court held

that the three year period of section 413 was more appropriate, and applied it to the action. 739 F.2d at 866–67.

We agree with the Third Circuit that speed and finality may not be as pressing concerns where the underlying dispute concerns a pension plan rather than day-to-day employment matters. However, we feel that the reasons favoring a departure from *DelCostello* are much weaker where a good portion of the underlying dispute concerns the negotiations and implementation of the plan, as here, rather than the settlement of a grievance taken under a pre-existing plan, as was the case in *Adams*. In addition, we think there are difficulties in limiting DFR challenges to the employment terms of collective bargaining agreements (and to the negotiations leading to them) to six months, but in allowing the pension terms of the same agreements (arising from the same negotiations) to be challenged for up to three years. Thus we believe that the considerations underlying *DelCostello* apply sufficiently more strongly here than they did in *Adams* to make the six month section 10(b) period more appropriate than the three year ERISA section 413 period.

█ Having concluded that the six month limit of section 10(b) is applicable to UIFO's DFR claim, we must now consider UIFO's argument that the claim is not barred under this statute of limitations. UIFO alleges that its members were injured by the failure of ALPA and United to reach agreement on pension plan changes before the end of 1981, and by ALPA's failure to negotiate a plan which would "apply negotiated pension improvements equally to all pilot retirees covered by the plan," even though "[b]efore United and ALPA agreed to modify the plan in June 1982, they knew or should have known that ... [the] 1981 retirees would be deprived of

the opportunity to obtain an IRA rollover." UIFO Br. 6; Complaint ¶ 10. The original injury occurred when United and ALPA failed to reach agreement before the end of 1981. A subsequent injury occurred by UIFO's own allegations no later than June 24, 1982, when the Supplemental Agreement was signed. Causes of action based on entry into collective bargaining agreements accrue, and section 10(b) starts to run, when the contract is signed. *Local Lodge No. 1424, International Association of Machinists v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (*"Bryan Manufacturing"*) (NLRB unfair labor practice action). *Bryan Manufacturing* governs the application of section 10(b) to employee DFR actions against unions. *Metz*, 715 F.2d at 305–06. Since the Supplemental Agreement was signed on June 24, 1982, but suit not brought until February 2, 1983—more than six months later—UIFO's DFR claim against ALPA is barred by section 10(b). Consequently, the action against United as a party to UIFO's breach of its DFR is also barred. *Metz*, 715 F.2d 306.[14]

### IV

In light of our conclusions that Counts I and II of the complaint were properly dismissed by the district court, the district court did not abuse its discretion in dismissing the pendent state law counts. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The judgment of the district court is AFFIRMED.

---

**14.** Insofar as UIFO claims a "continuing violation" until November 10, 1982, when it elected some form of distribution other than lump sum distribution, its claim must fail. The B Plan and the Directed Account Plan are both employer-administered plans, not joint employer-union-administered plans. Thus the union's involvement with the plan terminates upon signing of the collective bargaining agreement. Moreover, the concept of continuing violation is not applicable in unfair labor practice actions, *Bryan Manufacturing*, 362 U.S. at 422–23, 80 S.Ct. at 829–30, nor in DFR actions, *Metz*, 715 F.2d at 305–06.