**Paul RENNEISEN, et al.,**
**Plaintiffs–Appellants,**

**v.**

**AMERICAN AIRLINES, INC.,**
**Defendant–Appellee.**

**No. 92–1213.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1992.

Decided March 24, 1993.

Rehearing Denied April 22, 1993.

adequately served as the requisite "written state-  ment" in that case.

Thomas H. Geoghegan (argued), Leon M. Despres, R. Edward Wilhoite, Jr., Despres, Schwartz & Geoghegan, Chicago, IL, for plaintiffs-appellants.

Joel H. Kaplan, David J. Rowland, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Gregory S. Lewis (argued), Harry A. Rissetto, Morgan, Lewis & Bockius, Washington, DC, Richard A. Malahowski, American Airlines, Inc., Dallas, TX, for defendant-appellee.

Before CUMMINGS and MANION, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

CUMMINGS, Circuit Judge.

In 1983, American Airlines was losing money in the wake of airline deregulation and rising fuel prices. In order to cut labor costs, it struck a deal with the pilots' union. The union, Allied Pilots Association, relinquished wage and benefit guarantees for pilots not yet hired; in return American promised to preserve the wages and benefits of current pilots. On November 4, 1983, American and the union memorialized their deal in an "Agreement" that divided the union into A-scale pilots with wage and benefit guarantees, hired before November 4, and B-scale pilots without guarantees, hired afterwards. The Agreement further provided that the A-scale pilots' guarantees would not be rebargained unless a majority of the A-scale pilots voted to do so.

Plaintiffs are several B-scale pilots who sued American, claiming that the Agreement with the pilots' union is an illegal restraint on collective bargaining under Section 2 of the Railway Labor Act ("RLA"), 45 U.S.C. § 152, and an illegal restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. The RLA sends most disputes between transit workers and their employers to arbitral boards, so that district courts have limited jurisdiction over RLA claims. Because plaintiffs could not show that the Agreement struck "a fundamental blow to union or employer activity and the collective bargaining process itself" under *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 442, 109 S.Ct. 1225, 1235, 103 L.Ed.2d 456, the district court dismissed plaintiffs' case for lack of jurisdiction. Without the RLA's support, plaintiffs' other counts crumbled as well: the district court found that antitrust labor exemptions barred plaintiffs' Sherman Act claims, and dismissed as moot plaintiffs' motion to certify all B-scale pilots as a class. Plaintiffs appeal these dismissals.

We conclude that plaintiffs have sued American because they cannot persuade their own union to challenge an Agreement that gives more security to other workers in the union. Accordingly, we hold that plaintiffs have not stated a claim for which relief can be granted because RLA Section 2 does not give minority groups in a union a cause of action against their employer for adhering to agreements that the union decides not to challenge. Although the district court erred in concluding that it lacked jurisdiction to hear this case, its careful substantive analysis supports our dismissal of plaintiffs' case under Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

## I.

In 1983, American lay supine, pinned by rising fuel costs and a fleet of aging, inefficient aircraft, while lower-cost carriers empowered by airline deregulation penetrated deeper into its market share. American states that between 1978 when deregulation began and 1983, its fleet shrank by 10 percent, it furloughed 10 percent of its pilots and it hired no new pilots (defendant's brief at 3). American believed that fuel and capital improvement costs (aircraft maintenance and replacement) were relatively fixed industry-wide, but that labor costs were about 35 percent of its total budget, as against 20–25 percent for the low-cost carriers. To halt its declining market share and escape the threat posed by low-cost carriers, American decided it needed to cut labor costs. To this end, it consummated agreements with all its unions, including the pilots' union.

The agreements shared a common premise: protect the wages and benefits of current workers, but hire new workers at "market" rates that matched more closely the wages and benefits paid by low-cost carriers. American styled this a "two-tier" proposal; it reached two-tier agreements with the mechanics' union in February of 1983, and with the flight attendants' and pilots' unions in November of 1983. The Agreement between the pilots' union and American, dated November 4, 1983, provided:

A. JOB SECURITY * * *

The Company [American] will guarantee employment and * * * job security forever * * * to all pilots * * * who were on * * * active flight payroll on November 1, 1983 * * *.

\*　　\*　　\*　　\*　　\*　　\*

B. PAY AND RETIREMENT BENEFIT PROGRAMS FOR PILOTS HIRED PRIOR TO NOVEMBER 1, 1983

1. The Company agrees that it will take no action * * * to diminish the pay or the retirement benefit programs [of]

pilots hired prior to November 1, 1983 * * *.

2. This Agreement * * * shall remain in effect so long as any pilot with job security remains in the [Company's] active employ * * * [but] this Agreement may be changed by unanimous agreement between the parties and a majority of the pilots with job security * * *.

\*　　\*　　\*　　\*　　\*　　\*

C. Nothing contained herein shall * * * restrict either party from negotiating a change in the differentials between the respective pay or the retirement benefit programs of the [A-scale and the B-scale] pilots * * *, provided, however, that neither party will attempt to totally eliminate the existing differentials.[1]

Under other provisions of the Agreement, the pilots relinquished a 7 percent wage increase and accepted a reduced rate of vacation accruals. American promised to recall all furloughed pilots, and to add 200 planes to its fleet of 238. American's plan to cut labor costs and make capital investments in its fleet was an unqualified success. Today American is a leader in the airline industry. Its success has allowed it to hire many new pilots—59 percent of its pilots in fact—since it negotiated the Agreement with the pilots' union.

Since 1983 the pilots' union and American have met four times to negotiate the differentials between A-scale and B-scale pilots, most recently in 1991. American contends that as of 1991, the differentials have for practical purposes been eliminated, and that the A- and B-scale designations function as an integrated seniority system where senior B-scale pilots have effectively the same wages and benefits as A-scale pilots. The seven plaintiffs argue that differentials remain, and, more fundamentally, that the pilots' union is weakened and divided by the Agreement, to the point that the Agreement unlawfully restrains the pilots' ability to bargain collectively in violation of the RLA.

---

1. The pleadings, briefs and opinion below denote the contested parts of the Agreement as "Supplement B". Supplement B is entitled "Agreement" and contains subheadings A, B and C, so that we refer to it as "the Agreement" to avoid confusing it with subheading B.

Congress enacted the RLA in 1926 to ensure that labor unrest would not disrupt transportation networks so vital to the nation's economy. The Act sought to give labor and transportation companies a framework to resolve disputes peacefully through protracted negotiations and compulsory mediation rather than through strikes. 45 U.S.C. § 151(a); Theodore Kheel, 9 *Labor Law* § 50.02. Congress extended the RLA to include air carriers in 1936. 45 U.S.C. § 181. The RLA focuses on establishing certified representatives for employee groups in the transportation industry, and on monitoring the process of collective bargaining between the representatives and the employers. Sections 3 and 4 of the RLA constitute an administrative agency, the National Mediation Board (NMB), to supervise "major" disputes about union representation or contract formation, and an arbitral tribunal, the National Railroad Adjustment Board (NRAB), to settle "minor" disputes about the interpretation of existing contracts. 45 U.S.C. §§ 153–155. See *Consolidated Rail Corp. v. Railway Labor Executives Ass'n,* 491 U.S. 299, 302–303, 109 S.Ct. 2477, 2479–80, 105 L.Ed.2d 250; *Brotherhood of Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 35, 77 S.Ct. 635, 637, 1 L.Ed.2d 622; *Elgin, J. & E. Railway v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886. The RLA also creates detailed procedures for resolving disputes before the NMB or the NRAB; Section 2 lays out general ground rules, and Sections 5–9 set forth the specific requirements applicable to mediation or arbitration. 45 U.S.C. §§ 152, 155–159.

Plaintiffs' complaint alleges that the Agreement's thirty-year waiver of the right to rebargain A-scale guarantees violates parts First and Fourth of RLA Section 2. Part First orders carriers and employees to make reasonable efforts to settle disputes; part Fourth empowers employees to bargain collectively through their representatives, and forbids carriers from "interfer[ing] in any way with the organization of its employees." Plaintiffs' complaint also alleges that American violated part Ninth of RLA Section 2 by bargaining separately with a party (the A-scale pilots) that is not the pilots' designated representative. Part Ninth provides that disputes over the identity of authorized representatives will be investigated by the NMB, and that carriers must deal exclusively with the certified representative of its employees.

Plaintiffs make three arguments about how the Agreement works to undermine collective bargaining. First, they complain that the Agreement forces B-scale pilots to make all the concessions in contested areas such as pension benefits and health-care costs because the A-scalers have locked-in guarantees. Plaintiffs offer an alternative statement of the same problem by asserting that the Agreement gives A-scale pilots an illegal veto over any concessions the B-scale pilots might propose, forcing tripartite bargaining on fundamental contract issues. Second, plaintiffs challenge the Agreement's term: A-scale guarantees will exist until the last A-scale pilot leaves American, which could take 30 years or more. Since these guarantees are not subject to rebargaining unless a majority of the A-scale pilots vote them away, plaintiffs argue that this creates a 30–year waiver of the right to bargain that is void under federal labor policy. Third, plaintiffs assert that the Agreement serves no business purpose today save to weaken the union; because it has outlived whatever imperatives impelled its formation, it must be discarded.

The heart of plaintiffs' complaint appears to be that giving part of the union guaranteed benefits and wages undermines the entire union's ability to bargain as an effective unit, regardless of the actual disparities between the two groups. However, we did find one reference in plaintiffs' briefs to an existing disparity between A-scale and B-scale benefits. In 1987, American tried to rescind a "lump-sum distribution option" of the pilots' pension plan. After the A-scale pilots objected, an arbitrator found that the Agreement barred American from revoking the lump-sum option for A-scale pilots (plaintiffs' brief at 11). Plaintiffs do not say whether American ultimately revoked the option for B-scale pilots

or whether the differential still exists. Beyond this, the only concrete disparity between A-scale and B-scale wages and benefits seems to be that the former group of employees possesses guarantees the latter lack.

## II.

■ Plaintiffs confront a threshold hurdle: does a district court have jurisdiction under the RLA to hear this case? The district court found it did not. Incredibly, plaintiffs' jurisdictional statement asserts that "jurisdiction was not disputed" (plaintiffs' brief at 5). Because the district court denied jurisdiction in part by evaluating the substance of plaintiffs' claims, plaintiffs may perhaps be forgiven for plunging straight into the merits. But their briefs do not offer independent discussion of this central issue, confining their arguments instead to invectives directed against the Agreement. We stress as we have before that a district court's lack of subject matter jurisdiction cannot be cured by agreement of the parties. *Metropolitan Life Insurance Co. v. Estate of Cammon,* 929 F.2d 1220, 1222–1223 (7th Cir.1991). Parties should address jurisdictional questions directly in the materials they present to this Court—especially when they lose on this ground below.

■ This Court's previous encounters with the RLA establish that "[t]he scope of federal courts' jurisdiction over RLA violations is limited * * *." *Brotherhood of Railway Clerks v. Atchison, Topeka and Santa Fe Railway,* 847 F.2d 403, 408 (7th Cir.1988). The district court read *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 ("*TWA*"), to counsel dismissal of plaintiffs' claims, but *TWA* cannot support a denial of jurisdiction in the present case. *TWA* reviewed conduct that unions and employers engage in after they have completed compulsory RLA mediation and failed to settle their differences. Under the RLA, in major disputes employers or unions may resort to what is called "self-help" once negotiations break down. These efforts seek to gain economic leverage over the bargaining opponent; the union strikes, and the employer tries to wait out the strike. One party may complain that the other's tactics violate some provision of the RLA. In *TWA,* for example, the union asserted that the employer violated RLA Section 2 Fourth by offering certain seniority and placement preferences to flight attendants who returned to work before the strike was over. *TWA* held that the airline's actions did not interfere with employees' right to bargain collectively, and consequently did not violate Section 2 Fourth. *Id.* at 443, 109 S.Ct. at 1235. *TWA* did not find that the trial court lacked jurisdiction to hear the union's claims; the union lost on the merits because the employer's actions were lawful. *TWA* therefore does not support the district court's reasoning. It is not about jurisdiction, and its facts concern post-mediation self-help challenged by a union, rather than a collective bargaining agreement challenged by a non-representative party as in the present case.

The district court cited *TWA* correctly for the proposition that Section 2 Fourth "address[es] primarily the precertification rights and freedoms of unorganized employees." *Id.* at 440, 109 S.Ct. at 1234. *TWA* emphasized that Section 2 Fourth was designed to protect workers who had not yet organized a RLA–certified union. But the district court then transformed an observation about Section 2's substantive focus into a heightened jurisdictional barrier, concluding that where pre-certification conduct was not at issue, "jurisdiction under Section 2 Fourth is limited to actions * * * that constitute 'a fundamental blow to union or employer activity and the collective bargaining process itself.'" 1991 Westlaw 285283 at 11, quoting *TWA* at 442, 109 S.Ct. at 1235. This misconstrued *TWA.* That case said only that the RLA was silent on the scope of allowable self-help, and that courts should hesitate to "imply limitations on all but those forms of self-help that strike a fundamental blow" to collective bargaining—revealing that *TWA* offered this phrase to help courts analyze the merits of self-help actions, and not to determine if a court has jurisdiction

in the first instance. *TWA* at 442, 109 S.Ct. at 1234.

Other parts of *TWA* suggest the proper analysis to determine whether a federal court has jurisdiction to hear an RLA claim. *TWA* acknowledged that in some cases self-help might run afoul of the RLA. By implication, a party challenging self-help would lack a remedy unless a federal forum were available, because self-help occurs after parties have complied with the RLA's mandatory dispute resolution scheme. *TWA*, 489 U.S. at 442, 109 S.Ct. at 1234. *TWA*'s jurisdictional test can be found then in its statement that "judicial intervention in RLA procedures [is] limited to those cases where 'but for the general jurisdiction of the federal courts there would be no remedy * * *.'" *Id.* at 441, 109 S.Ct. at 1234, quoting *Switchmen v. National Mediation Board*, 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61. To determine whether the district court had jurisdiction, we must ask whether plaintiffs would have a remedy against American absent the jurisdiction of federal courts. If plaintiffs could bring their RLA claims before the NMB or the NRAB, then the trial court lacked jurisdiction because the RLA mandates a statutory forum for plaintiffs' claims.

■ Plaintiffs here have no remedy under the RLA except a review in federal court, and hence the district court had jurisdiction to hear their claims. This result follows *Air Line Pilots Association v. UAL Corporation*, 874 F.2d 439, 444–445 (7th Cir.1989) ("*UAL*"), which held that one union had jurisdiction to challenge a second union's collective bargaining agreement as a violation of the first union's right to bargain. Much like the present case, the pilots in *UAL* were not certified to challenge the collective bargaining agreement they protested. They claimed that their employer had breached its duty to bargain collectively with them by striking the agreement with the other union. Also like the present case, the *UAL* pilots brought a "major" attack on the validity of an existing collective bargaining agreement, rather than a "minor" grievance over an agreement's interpretation. We noted above that major disputes typically fall under the NMB's jurisdiction, while minor grievances are heard by the NRAB. Here, however, plaintiffs could not bring a major dispute under Section 6 because they are not an RLA-certified representative. 45 U.S.C. § 156. This in turn suggests that the NMB would not hear their complaint under Section 5.[2] 45 U.S.C. § 155. In sum, "where the arbitral board cannot provide a remedy that will protect a party from the consequences of [an RLA violation], the district court has equitable jurisdiction to do so * * *." *Id.* at 445.

*Brotherhood of Railway Clerks v. Atchison, Topeka and Santa Fe Railway*, 847 F.2d 403 (7th Cir.1988), supports today's analysis. That case affirmed that the district court lacked jurisdiction because the RLA required the union and the employer to bring their minor dispute before the NRAB. *Id.* at 409; see *Chicago River & Indiana Railroad*, 353 U.S. at 39, 77 S.Ct. at 639. The employer and the union disagreed as to whether their collective bargaining agreement allowed the employer to "buy" employees out of union-negotiated contracts. We found that the NRAB had exclusive jurisdiction over the case because it involved the interpretation, not the validity, of a collective bargaining agreement. *Id.* Because the union had an arbitral remedy, the district court lacked jurisdiction: "[i]n those disputes in which the RLA's extra-judicial dispute-resolution mechanisms are capable of adequately protecting the rights of the parties, federal courts may not interfere * * *." *Id.* Here plaintiffs seek to suspend a collective bargaining agreement, and they cannot do so under Section 6 because they are not a certified representative under the RLA. Since neither the NMB nor the NRAB of-

**2.** *UAL* did not suggest that the NMB was the proper forum to hear the pilots' third-party challenge to a collective bargaining agreement. 874 F.2d at 443–445. We follow *UAL*, therefore, in assuming that the NMB does not take jurisdic-

tion over complaints that are not brought by certified representatives under the RLA. If the NMB had statutory jurisdiction over the present dispute, of course, the courts would lack jurisdiction.

fers a forum for their claims, the trial court had jurisdiction to hear the claims, just as it did in *UAL.* 874 F.2d at 444–445.

■ We note that the district court also erred when it implied that the present dispute was "minor" because it was not "likely to lead to a pilots' strike." 1991 Westlaw 285283 at 18. We pointed out before that this is not the test. *UAL,* 874 F.2d at 444. Minor disputes occur over contract interpretation. See *Chicago & North Western Transportation Co. v. Railway Labor Executives Ass'n,* 908 F.2d 144, 148 (7th Cir.1990); *National Railway Labor Conference v. International Ass'n of Machinists,* 830 F.2d 741, 745–746 (7th Cir. 1987). Plaintiffs do not raise any issues about how to interpret the Agreement; rather, they challenge its validity and seek an injunction to render it void. This is a classic "major" dispute and therefore outside the NRAB's arbitral authority.

### III:

■ After finding that it lacked jurisdiction, the district court offered a careful substantive analysis of plaintiffs' claims, and we read its opinion to support a conclusion that the RLA does not offer plaintiffs any relief from the Agreement. This case must be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. RLA Section 2 was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest. Since plaintiffs' own union has not challenged the Agreement, we cannot find that the Agreement violates the union's right under the RLA to bargain collectively for its members.

The district court properly rejected plaintiffs' claim that the Agreement waives the right to bargain on fundamental contract issues. As Judge Rovner pointed out, the 1983 Agreement expressly allows the union to seek A-scale wages and benefits for the B-scale pilots: "Nothing contained herein shall be deemed to restrict either party from negotiating a change in the differentials between the respective pay or the retirement benefit programs of the pilots * * * hired on or after November 1, 1983, provided, however, that neither party will attempt to totally eliminate the existing differentials." The district court read this to require a one-penny differential to remain between A-scale and B-scale wages, and we agree. The Agreement does not waive the right to bargain on any significant issues that could support a cause of action under RLA Section 2 Fourth.

The district court was also correct to find that the Agreement does not give A-scale pilots an illegal veto over contract issues, and does not require tripartite bargaining on fundamental contract issues. The court observed that B-scale pilots comprise 59 percent of the union's membership, and as such can bargain and vote for any contract within one penny of A-scale pay and benefits. We again agree. Furthermore, if most B-scale pilots agreed with plaintiffs about the damaging effects of the Agreement, the B-scale pilot majority could try to persuade a majority of the A-scale pilots to vote away their rights under the 1983 Agreement. As time passes and B-scale pilots become an ever-larger percentage of the union, the A-scale guarantees will fade into insignificance. Even if the existence of A-scale and B-scale groups makes it more difficult for the union to agree on its negotiating position today, plaintiffs' arguments about 30–year tripartite bargaining are baseless because the value of A-scale concessions to American can only decline as the percentage of A-scale members shrinks.

Plaintiffs' claims against American cannot succeed because their own union and American are equally "guilty" of adhering to the 1983 Agreement. One question dooms plaintiffs' case: why blame American for honoring a deal it made with the pilots' union ten years ago, when the union is equally able to challenge that deal and American has nothing to gain by trying to revoke the A-scale pilots' guarantees? Plaintiffs in their briefs attack the A-scale guarantees with particular ire. The guarantees offer superseniority to A-scale pilots. We see nothing sinister and nothing contrary to the RLA or federal labor policy in an agreement that permanently gives

benefits to a shrinking percentage of a union's membership. Plaintiffs' effort to compare locked-in benefits to a permanent waiver of the right to bargain in the first instance borders on outrageous. Many union agreements allocate superior benefits to certain groups of workers. The added wrinkle in plaintiffs' case is temporal: the guarantees are permanent. From the perspective of the union in 1983, however, permanent guarantees for the 1983 pilots were far preferable to negotiable guarantees. Plaintiffs now seek to blame American for their union's success ten years ago.

*Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51, suggests that American cannot be liable for honoring its Agreement with the union. *O'Neill* holds that a union does not breach its duty of fair representation unless it acted "arbitrarily and irrationally" in reaching a settlement with the employer, and "a settlement is not irrational simply because it turns out *in retrospect* to have been a bad settlement." *Id.* 499 U.S. at ——, 111 S.Ct. at 1136 (emphasis in original). In *O'Neill*, at least, the Court was able to conclude with the benefit of hindsight that the union had struck a bad settlement. In the present case, however, A-scale pilots moved to intervene to protect their rights under the 1983 Agreement,[3] and we are not persuaded that the 1983 Agreement was a bad deal for the union in the long run. *O'Neill* suggests that plaintiffs should not be able to sue American for adhering to the Agreement with the union where the Agreement does not violate the union's duty of fair representation and it has not been challenged by the plaintiffs' own union.

*United Independent Flight Officers, Inc. v. United Airlines, Inc.*, 756 F.2d 1262, 1269–1273 (7th Cir.1985), furnishes further evidence that American cannot be vicariously liable for an agreement with its union that the union itself has not challenged. There a pilot group sued its union for breach of the duty of fair representation and named United Airlines as a party to that breach. The pilot group attacked the tax implications of a lump-sum pension distribution option that had been negotiated by the union with the company; the benefits at issue and the parties' alignment were very similar to the present case. The pilot group lost because their claims were not timely; we found that a six-month statute of limitations applied to duty of fair representation claims. *Id. United Independent Flight Officers* suggests that where a union has not challenged an agreement, a minority group of employees cannot sue their employer under RLA Section 2 for honoring an agreement that does not violate the union's duty of fair representation.

For these reasons, we hold as a matter of law that under RLA Section 2 First and Fourth, American does not refuse to bargain or interfere with the union's right to bargain collectively when it honors the terms of an agreement with a union that the union itself has not challenged. Since plaintiffs concede that their Sherman Act claims must be dismissed if their RLA claims fail (plaintiffs' brief at 26–27, reply brief at 23), their case has expired. The district court's dismissal of plaintiffs' case is AFFIRMED subject to the minor modifications noted in this opinion.

---

3. In a minute order dated December 21, 1990, the district court allowed the group of A-scale pilots to intervene for the limited purpose of responding to motions.