Cliff THONEN, et al., Plaintiffs,

v.

McNEIL–AKRON, INC., et al., Defendants.

Civ. A. No. C85–1066A.

United States District Court, N.D. Ohio, E.D.

July 24, 1986.

See also 661 F.Supp. 1276.

Mark A. Rock, Joyce Goldstein, Schwarz-wald, Robiner, Wolf & Rock, Cleveland, Ohio, for plaintiffs.

Clair E. Dickinson, John C. Fickes, John W. Solomon, Sidney C. Foster, Inc., Akron, Ohio, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiffs in this action seek injunctive relief and damages for alleged violations of

their contractual rights created by collective bargaining agreements, and of their statutory rights created by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461 (1982 & Supp. I 1983 and II 1984). These rights were allegedly abridged by the defendants' actions to reduce plaintiffs' post-retirement health benefits. Pending before the Court are cross-motions for summary judgment on the issue of liability. Plaintiffs also request a permanent injunction.

For the reasons set forth below, this Court determines that plaintiffs' contractual rights to post-retirement health benefits were breached, and that they are entitled to partial summary judgment based on their contract theory of liability and to a permanent injunction. Defendants are entitled to partial summary judgment on liability under plaintiffs' ERISA theory, except that plaintiffs Thonen and Hannaman are entitled to summary judgment on their claims of breach of fiduciary duties under ERISA.

Jurisdiction rests on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982) ("§ 301"), § 502(a) of ERISA, 29 U.S.C. § 1132(a) (1982), and 28 U.S.C. § 1331 (1982).

### I.

Defendant McNeil-Akron, Inc. ("McNeil-Akron") currently designs and sells machine tools for the rubber and plastics industries. It employed the plaintiffs before their retirement. Within the last decade, McNeil-Akron has been owned by defendants McNeil Corporation and Equipement Méchniques Specialisés. McNeil-Akron is currently owned by a third company. The three defendants are hereinafter collectively designated as "the company," and the Court does not fix the liability for each individual defendant in ruling upon these motions, but rather determines whether any of the defendants is liable to any of the plaintiffs.

Plaintiffs Cliff Thonen, Ralph Hannaman, Clarence W. Archer, and Joseph Maxim are former hourly employees of the company who retired in 1982. Their complaint, filed on April 9, 1985, alleges that they are eligible for participation in a health insurance plan for retirees created by collective bargaining agreements entered into in 1979 and 1982. They claim that these contracts intended to create lifetime health benefits for employees retiring between May 7, 1979 and December 31, 1983. By letter dated February 14, 1984, the company allegedly informed retirees that it could not afford to continue their health benefits negotiated under the labor agreements and requested each retiree to select one of three alternatives presented by the company. Plaintiffs aver that a letter dated May 4, 1984 required retirees to choose between a new health insurance plan created by the company and a monthly payment of fifty dollars by the company to permit them to purchase their own insurance. They maintain that neither letter offered the option of retaining the health plan negotiated by their union and provided by the labor agreements in 1979 and 1982. On June 30, 1984, the company allegedly terminated the health care plan established by the collective bargaining agreements and imposed the two alternatives set forth in the letter of May 4, 1984. Plaintiffs assert that the company's actions are a willful violation of the collective bargaining agreements and the health care plan, compensable under § 301 and under ERISA. They also argue that defendants breached a fiduciary duty created by § 404 of ERISA, 29 U.S.C. § 1104 (1982) (§ 404).

Plaintiffs also seek to represent a class of persons who retired from the company between May 7, 1979 and December 31, 1983.[1] Their complaint requests a permanent injunction directing defendants to comply with the health insurance plan as allegedly established pursuant to the collective bargaining agreements, compensatory damages, disgorgement of profits resulting

---

1. Liability may be decided before the Court determines whether to certify a class of plaintiffs in this case. *See Weimer v. Kurz-Kasch*, 773 F.2d 669, 677 (6th Cir.1985) (class certification to be decided upon remand); *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 618 (6th Cir. 1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

from a wrongful termination of the insurance plan, punitive damages, and costs and attorneys' fees.

## II.

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

The nature of materials properly presented in a summary judgment pleading is set forth in Fed.R.Civ.P. 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.*, 729 F.2d 372 (6th Cir.1984). "[T]he party seeking summary judgment must *conclusively* show that there exists no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Bender v. Southland Corp.*, 749 F.2d 1205, 1210 (6th Cir.1984) (citing *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979)) (emphasis in original). However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III.

The following factual summary is based upon the materials appended to the cross-motions for summary judgment, including the affidavits of Cliff Thonen, Ralph Hannaman, Raymond Keller, and James Gibney; the affidavit of James Thomas filed by the defendants with their supplemental brief on the ERISA issue; defendants' responses to plaintiffs' first request for admissions, which was appended to plaintiffs' reply brief; and the defendants' answers to the complaint. Although defendants challenged the authenticity of plaintiffs' Exhibits 20–28 in their brief in opposition to plaintiffs' summary judgment motion, the authenticity of these exhibits has subsequently been admitted by the defendants. Defendants have attacked plaintiffs' affidavits and depositions as containing hearsay and statements not based upon personal knowledge. It is not surprising or unreasonable that hearsay statements should arise during discovery, and this Court has read the depositions, as well as all other portions of the record, with an eye towards excluding statements not admissible into evidence. Defendants have also questioned the propriety of assertions contained within the statement of facts of plaintiffs' summary judgment motion, arguing that some of the "facts" are not supported by the record. Defendants' attack on plaintiffs' statement of facts is misguided, as the drawing of inferences from the record is permitted, so long as potential problems with credibility are recognized. Plaintiffs' "statement of facts" is a legal argument;

the Court's statement of facts is culled from the record. Defendants have not formally moved to strike plaintiffs' statement of facts, but that motion would be denied if they had.

This dispute, when reduced to its simplest terms, revolves around the interpretation of an identical provision in two collective bargaining agreements. Prior to the successful negotiation of a new collective bargaining agreement in 1979 between McNeil-Akron and the United Steelworkers of America ("the union"), which represented a bargaining unit within the company's manufacturing plant, the union went on strike. One of the major issues leading to that strike was the provision by the contract of lifetime health benefits for retirees to be paid by the company. An agreement between the union and McNeil-Akron was subsequently executed on June 13, 1979. Section four of Article XVI ("§ 4") of that agreement provides in its entirety:

Effective May 7, 1979 all future retirees, age sixty-two (62) or over, will be covered by Hospital Expense Insurance, Surgical, X-ray and Diagnostic Laboratory, Emergency Accident, Emergency Sickness, Major Medical, Radiation Therapy and Prescription Drug coverage in effect at the time of their retirement. Coverage will include eligible dependents and will coordinate with Medicare when applicable.

An identical provision is contained in the next collective bargaining agreement between these parties, executed on May 6, 1982.[2] Nothing in either of these agreements specifically states that § 4 may be terminated by the company, or specifically limits the duration of that provision, although both contracts contain dates on which the collective bargaining agreements as a whole terminate. Until 1984, no post–1979 hourly retirees paid premiums for this coverage.

In response to financial difficulties beginning in 1980, the company shut down its manufacturing plant in late 1982 and con-

tracted out its manufacturing work. Despite this and other cost-cutting measures, the company remained in unstable financial condition. In January of 1984, management began to consider reducing its retirees' health benefits as a cost-cutting measure, even though these benefits had not been terminated at the time that the plant was closed. The idea of cutting retiree health benefits germinated with James Gibney, president of McNeil-Akron at that time. Gibney believed that the health benefits could be reduced or terminated for two reasons. First, he believed that the company was contractually obligated to provide these benefits only until the expiration of the 1982 collective bargaining agreement. Second, he was of the opinion that the post–1979 retirees had waived their right to participation in the program because they had all failed to pay premiums under § 3 of Article XVI of the labor contract, which provided:

Any pensioner who is enrolled under the Company's pensioner group insurance program shall monthly, on or before the last day of each month with respect to which he is so enrolled, make a payment to the Accounting Department in the full amount of the carrier's billing charge ... for the coverage for which the pensioner was enrolled for said month, and if, by the said last day of the month, the Accounting Department has not received such payment from the pensioner, the pensioner shall be disenrolled from all phases of the Company's pensioner group insurance program, said disenrollment to be effective as of the first day of the following month.

Once a pensioner has been disenrolled under the preceding paragraph of this Section 3, he may not thereafter re-enroll under the Company's pensioner group insurance program.

While bankruptcy was a possible consequence of failing to make a certain level of reduction in expenses, continuing to pay the retirees' medical benefits would not of itself bankrupt the company. However,

---

2. Because the relevant portions of the 1979 and 1982 labor contracts are identical, this Court's references to "the collective bargaining agree-

ment" and "§ 4" encompasses both contracts, unless specifically limited to one of the contracts.

these benefits became part of the company's costs which were targeted for reduction.

Gibney researched whether the retiree health benefits were vested for life by reading § 4 in both collective bargaining agreements. Although he conferred with his staff regarding the propriety of cutting off these benefits, Gibney did not contact the negotiators of the 1979 collective bargaining agreement to determine whether the benefits were meant to be vested for life. Gibney conferred with the company's lawyers with respect to the actions he contemplated taking, including the form of the letter which would notify the retirees of a proposed change in benefits and the viability of his plan to cut costs by various means, including by reducing the retiree health benefits. Gibney discussed the issue of whether the health benefits were vested for the life of the retirees with the company's attorneys because he was concerned that there might be a "side letter" not contained in the agreement; he learned that there was not. At this time when he contemplated changing the retirees' health benefits, Gibney was not aware of legal action involving retiree benefits reduction or of court decisions interpreting retiree benefit provisions as vesting the benefits for life. He did not believe that there was any legal risk to the company in reducing the retirees' health benefits.

On February 14, 1984, Gibney sent a letter to all company retirees, salaried and hourly. The letter stated that "[a]lthough we would like to continue [the medical insurance] program, we see no way to do so.... We realize that you will need time to rearrange your situation and secure health care protection through Blue Cross or some other insurance company." The letter set forth three alternative plans meant to provide interim insurance until each individual's insurance with the company would be terminated in either January, 1985, or June, 1985. Each employee was requested to return a card indicating his or her choice of the three alternatives, none of

which offered continued free insurance from the company under the then current plan. Although the letter stated that the company understood that this reduction and subsequent termination of benefits would not be "particularly appealing," it warned that "we do want to stay in business and trust that you agree that this program is better than nothing which we want to avoid."

Only nine of the seventy-three post–1979 retirees from the bargaining unit returned cards indicating their preferences for one of the three alternatives. The company was not pleased with this response, which it considered inadequate. In April, 1984, the company began to negotiate a change in the health benefits with the McNeil Akron Retirees Club ("MARC"), a voluntary organization of both salaried and union retirees.[3] Before the negotiations began, MARC informed Gibney that some retirees believed that the collective bargaining agreement guaranteed them lifetime health benefits from the company. Gibney negotiated with a group of about ten retirees involved with MARC, with James Thomas leading the negotiations for the retirees. Seven to ten meetings were held, during which Gibney again was made aware that some retirees believed that they were entitled to permanent health insurance.

In June of 1984, the company and MARC reached an agreement providing for a new health benefit plan. The agreement, which was drafted by Gibney and executed by the executive board of MARC, contains a provision designated as an "accord and satisfaction," which states that retirees of McNeil-Akron will be entitled to enroll in a new benefits plan, as described in a Retiree Health Insurance Booklet, in lieu of their previous health insurance benefits. The agreement between MARC and the company established premiums to be paid by each participant in the new plan, except dependent children, who would receive free coverage. Dependent children would be covered by the plan until age twenty-five, so long

---

**3.** The parties dispute whether MARC, through former union president James Thomas, approached the company about these negotiations, or vice versa. This is not a material fact, the dispute over which would prevent summary judgment.

as they were students in an accredited school. The new plan permitted the spouse and dependents of a retiree to continue enrollment after the retiree's death, if proper premiums continued to be paid. The agreement between MARC and McNeil-Akron also allowed retirees to opt out of the new plan by instead choosing what had been designated in the February letter as "Plan C." Plan C provided for termination of the health coverage by the company on June 30, 1984. In July, 1984, retirees choosing this alternative would receive the first of twelve monthly payments of fifty dollars to permit the purchase of insurance with another carrier. The agreement between the company and MARC would expire on June 30, 1987, subject to renegotiation. If extended, the agreement would be renegotiated each subsequent year.

On May 4, 1984, the company sent each retiree a letter communicating the two options negotiated with MARC. Each retiree was asked to return a card indicating his or her preference for joining the new health benefits program or accepting the monthly fifty dollar payments. Again, the company did not propose the option of maintaining the same coverage then currently available to the retirees. The large majority of retirees this time returned their cards and selected an option. Those who did not received a letter on June 26, 1984 again requesting them to indicate to the company their choice between the two options.

On June 14, 1984, letters were sent both to those retirees who chose to participate in the new insurance plan and to those who chose to accept the fifty dollar payments. The letter sent to retirees choosing the new plan purported that a new insurance benefits booklet was enclosed, although an accompanying note stated that these booklets were not yet available. The letter, which was signed by Gibney, also stated:

McNeil-Akron, Inc. and the McNeil Akron Retiree's Club have signed an Agreement of Understanding which outlines the principal aspects of our new program. However, for your benefit, we thought it would be more appropriate to also submit an Agreement to you personally to insure that you are apprised of its content and meaning. We are enclosing two copies for your review. You will note that it is basically what we outlined in our letter of May 4, 1984. In order to maintain proper records for ourselves and the insurance company, we must ask that you sign one copy and return it to us within 15 calendar days. Please be sure to also update the information requested.

The enclosed document, entitled "McNeil-Akron, Inc.-[retiree] Agreement," closely tracked the language of the agreement between MARC and the company. The provision which was labeled "Accord and Satisfaction" stated:

In consideration of McNeil entering into this accord and satisfaction with ___, the retiree in lieu of his or her previous health insurance benefits, hereby will be entitled to be enrolled in the new health insurance program. This new health insurance program will include improved benefits for the retirees and will be outlined in the Retirees Health Insurance Booklet submitted to the retiree and dated 1984 edition.

Above the signature line is the legend "SIGNATURE OF RETIREE TO CONFIRM UNDERSTANDING AND AGREEMENT."

The letter sent on June 14th by Gibney to those retirees who elected to receive the fifty dollar checks states:

McNeil-Akron, Inc. and the McNeil Akron Retiree's Club have signed an Agreement of Understanding which outlines the principal aspects mentioned in our letter of May 4, 1984. However, for your benefit, we thought it would be more appropriate to submit the Agreement to you which personally concerns your program under "Plan C". We are enclosing two copies for your review and would ask that you return one signed copy within 15 calendar days. This will enable us to maintain proper records for ourselves and the insurance company.

The agreement enclosed with this letter contained the following "accord and satisfaction" provision:

In consideration of McNeil-Akron entering into this accord and satisfaction with ___, the retiree in lieu of his or her previous health insurance benefits, hereby will be entitled to receive $50.00 per month effective July 1984 through June 1985 from McNeil-Akron, Inc. These monthly payments will represent a contribution toward the cost of an insurance policy retained by the retiree. A check to the retiree will be mailed on the first Wednesday of each month. All insurance claims of the retiree or family of the retiree will be submitted directly to the insurance company of the retiree and paid for by the retiree's insurance company and will not be paid by McNeil-Akron. Effective July 1, 1985, the monthly contribution will be discontinued and the last monthly check will be mailed by McNeil on June 5, 1985.

The agreement concluded, "MY SIGNATURE BELOW EVIDENCES MY CONFIRMATION OF THE UNDERSTANDING AND THE AGREEMENT INDICATED ABOVE AND CONFIRMS MY UNDERSTANDING THAT I WILL NO LONGER BE ENTITLED TO FUTURE HEALTH INSURANCE BENEFITS TO BE PAID BY McNEIL–AKRON AS OF JUNE 30, 1984." On July 16, 1984, retirees received their first fifty dollar payment and a letter indicating that their health insurance with McNeil-Akron had been terminated on July 1st.

The company's purpose in sending these agreements to each retiree for signature is unclear. In his deposition, Gibney testified that the agreement was sent in order to inform all retirees of the terms negotiated with MARC. At the same time, he stated, the document was meant to be a legally binding agreement, necessary in light of the controversy over the change of benefits, as demonstrated by the poor response to the February letter, and pursuant to the company's belief that MARC was not a legal entity. Insisting that the level of benefits remained the same following the beginning of the new plan, he maintained that "people sign documents whether they are representative of an improvement or a reduction in order to do it in a businesslike

fashion." Deposition of James L. Gibney ("Gibney dep."), at 111. Summarizing his intent in having the retirees sign an individual agreement, Gibney stated:

> The intent of the document was to bring to them, in front of them, the terms and conditions, and to have them sign that so that they were personally aware of it. They signed it, and they were in agreement with it.
>
> The second purpose of the document was to make them aware that their monthly contributions would be changed as stated in the document.

Gibney dep. at 112. Raymond Keller, treasurer of McNeil-Akron, stated that his understanding of the company's position was that the agreements sent to each retiree were the documents which bound the two parties to the new arrangements; the card returned pursuant to the May 4th letter merely indicated a retiree's intent to accept one option or the other.

All former bargaining unit employees except Thonen and Hannaman, including Archer and Maxim, chose to participate either in Plan C or the new benefits plan requiring the payment of premiums. Each of these retirees executed the agreement enclosed in the June 14th letter. Thonen returned the card enclosed in the May 4th letter after having crossed out the two options and writing on the bottom, "At the present time neither plan presented is acceptable to me. Please continue my coverage as negotiated by the contract." Hannaman did not return the card, but instead wrote a letter dated May 8, 1984, which stated, "As a former McNeil retiree under certain Contractual conditions, I feel that McNeil is obligated to my Contractual Rights, not the Retirees' Committee." Hannaman also called the company to express his displeasure.

Although they were aware that Thonen and Hannaman did not wish to submit to either new benefit plan, Gibney and Keller decided to enroll them in Plan C and send them the monthly fifty dollars checks. Neither Thonen nor Hannaman cashed any of the twelve checks they received. Thonen sent the first check back, writing on

the bottom, "Please refer to my correspondence of July 3, 84. The 'Retirees' Club' nor anyone else has the authority to change my health plan. Please discontinue checks (Plan C) and continue my coverage as negotiated." Despite his refusal to recognize the validity of Thonen's and Hannaman's claims to the old plan benefits, Gibney instructed his staff to continue paying bills submitted by them. Thonen did submit bills which were paid as though he were enrolled in the new plan, although he never paid any premiums. Hannaman did not submit any bills under the new plan, despite injuries and illnesses since mid–1984.

## IV.

In arguing that the company was obligated to provide full health benefits to the retirees for life, plaintiffs have at their disposal a surprisingly large body of Sixth Circuit law discussing contractual obligations of employers on this issue. Plaintiffs note, however, that "[t]he Sixth Circuit has not yet been forced to consider whether its retiree insurance decisions might properly by [sic] founded upon ERISA or its protective purposes," Plaintiffs' summary judgment motion at 47, and they urge that this Court consider whether the company's actions constitute a breach of fiduciary duty under § 404. Because plaintiffs seek a disgorgement of profits, which is a remedy available under the equitable doctrines of trusts codified by ERISA, and not available under the legal doctrines of contracts, the Court will discuss both the contractual and ERISA arguments presented by the plaintiffs.

### A. *Contract Principles*

■ Principles which have been well-developed by the Sixth Circuit control this Court's determination of whether the collective bargaining agreement created vested lifetime health benefits for retirees. Federal rules of decision must be applied in cases involving employee welfare benefit plans, even where ERISA does not provide governing law. *In re White Farm Equipment Co.,* 788 F.2d 1186, 1191 (6th Cir.

1986). However, traditional contract rules will be applied to the interpretation of labor contracts where no substantive federal principles exist, so long as their application is not inconsistent with federal labor policies. *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard-Man, Inc.* 716 F.2d 1476, 1479, 1487 (6th Cir.1983), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

This Court's examination of the rights created for retirees by the collective bargaining agreement begins with a construction of the contract itself. First, the Court evaluates the explicit language of the provision which arguably creates lifetime benefits to determine whether it is ambiguous. *Yard-Man,* 716 F.2d at 1479. The Sixth Circuit has deemed such language as "will continue to cover such eligible retired employees" to be ambiguous, *Upholsterers' International Union of North America v. American Pad & Textile Co.,* 372 F.2d 427, 428 (6th Cir.1967), as well as the language "will provide insurance benefits equal to the active group." *Yard-Man,* 716 F.2d at 1480. In contrast, the phrase "will ... receive medicare complementary coverage on their hospitalization and surgical benefits for the pensioner and his spouse, if any, during the life of the pensioner at no cost to the pensioner" unambiguously created lifetime benefits. *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 616 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

■ If the key provision of the collective bargaining agreement is ambiguous, the court must "look to other provisions of the collective bargaining agreement for evidence of intent and an interpretation which is harmonious with the entire document." *Yard-Man,* 716 F.2d at 1480. *Yard-Man* identified several characteristics of the labor contract bearing upon the parties' intent with respect to lifetime retiree benefits. First, it noted that explicit termination provisions were set out for the insurance benefits of active employees separated from their employment, such as by lay-offs. The court found that the applica-

tion of such provisions to retirees was unlikely. *Id.* at 1481. Second, the court viewed a provision limiting benefits to a retiree's dependents after the retiree's death as one structured as an exception to an anticipated continuation of benefits beyond the expiration date of the collective bargaining agreement. *Id.* Third, the court believed that a provision in the agreement which stated that an early retiree's health care premiums would be paid by the company when that retiree reached age sixty-five would be an illusory promise if the benefits would not be guaranteed after the expiration of the contract, since few employees would become eligible for such a deferred benefit within the short life of the contract. *Id.* Fourth, the court observed that other specific durational limits in the collective bargaining agreement suggest that the lack of such a limit on retiree benefits means that the parties intended them to outlast the contract. *Id.* at 1481–1482; *see also Upholsterers' International,* 372 F.2d at 428. Finally, the court rejected management's contention that the general durational clause of the collective bargaining agreement demonstrated an intent by the parties that retiree benefits were guaranteed only during the life of the contract. The court stated that the specific characteristics of the contract indicating that the retiree benefits were intended to continue throughout the retirees' lives outweighed the implication of a routine termination clause. *Id.* at 1483; *see also Weimer v. Kurz-Kasch, Inc.,* 773 F.2d 669, 676 (6th Cir.1985).

In addition to the content of a collective bargaining agreement, the Sixth Circuit has identified two considerations favoring survival of retiree benefits beyond the life of the contract. First, the court stated that retiree benefits normally vest, because unions and management are not required to negotiate on behalf of retired employees, and current employees want to guarantee their retirement benefits before they depart from the bargaining unit. *Yard-Man,* 716 F.2d at 1482; *Policy,* 770 F.2d at 613. Second, the court categorized retiree benefits as "status benefits," which ostensibly continue so long as the status of retiree

continues. Thus, there is an inference that retiree benefits are contractually vested when provided for in a labor agreement. *Yard-Man,* 716 F.2d at 1482. This inference in favor of vesting does not rise to the level of a presumption. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Cadillac Malleable Iron Co.,* 728 F.2d 807, 808 (6th Cir.1984). However, failure to give effect to these two propositions may result in reversible error. *See Policy,* 770 F.2d at 616.

In addition to the terms of the contract itself, extrinsic evidence of the parties' intent may be considered. The company's history of providing lifetime insurance benefits before the negotiation of the agreement at issue tends to show an intent to provide continuing benefits for retirees. *Upholsterers' International,* 372 F.2d at 427–428. The continuation of paying retirees' benefits after the collective bargaining agreement expires is also evidence of the parties' intentions. *Yard-Man,* 716 F.2d at 1481; *Weimer,* 773 F.2d at 676 n. 6. Evidence of the parties' bargaining history—such as a series of collective bargaining agreements and strikes—and of statements made by the employer during the retirees' exit interviews has also been approved as probative of intent. *Cadillac Malleable,* 728 F.2d at 808–809. Finally, the reasons stated by the employer for terminating retiree benefits can also be evidence of the parties' intent. *Weimer,* 773 F.2d at 676 n. 6. However, the Sixth Circuit has demonstrated a proclivity for deciding the issue by interpreting the contract within its four corners. *Id.*

■ Applying the framework established by *Yard-Man* and its progeny, this Court determines that the parties intended the plaintiffs' retiree benefits to survive the expiration of the labor agreements. Section 4's statement that "all future retirees ... will be covered" is comparable to the relevant language in *Upholsterers' International* and *Yard-Man,* which standing alone could be interpreted as urged by either the plaintiffs or the company. However, the remaining terms of the contract

dispel any doubt about the parties' intentions.

The lack of a durational provision for the retiree benefits established by § 4 is contrasted by durational limits established in other sections of the contract. Most significantly, Article XV, which immediately precedes the provisions on pensioners' benefits, provides for health insurance for active employees "to be maintained so long as the employee is on the payroll of the Company, and so long as this Agreement is in force." Since this provision is the counterpart of § 4 for active employees, the addition of durational language to Article XV which is absent from § 4 is strong evidence that the parties did not intend that the retirees' health benefits would terminate at the expiration of the collective bargaining agreement. In addition, Article VII of the contract provides specific termination dates for the insurance of active employees who discontinue their employment with the company due to lay-offs, leaves of absence, strikes, and other protracted absences from employment. Moreover, durational limits are established for provisions defining rights and responsibilities with respect to vacations (Art. XIII, § 1), life insurance (Art. XIV, § 1), the pension agreement (Art. XVIII), and strikes (Art. XIX, § 1). The liberal use of language limiting the effect of contractual provisions to the life of the contract or some other definite date indicates that the parties intended to continue retiree benefits throughout the lives of the retirees.

Section 4 also provides that retirees' health benefits "will coordinate with Medicare when eligible." Since § 4 applies to future retirees who are age sixty-two or over, employees who reached age sixty-two during the late stages of the contract would find that the health benefits would expire before their Medicare benefits began. The reading of § 4 which the company espouses, then, would result in the "illusory benefits" which were disfavored by the *Yard-Man* court.

Finally, the principles stated by the *Yard-Man* court which favor vesting of health insurance benefits beyond the life-time of a collective bargaining agreement are applicable in this case. The subject of this litigation is retirement benefits, which active employees could not guarantee that the union would try to provide for them after they leave the bargaining unit. It is clearly logical that employees about to retire would negotiate vested retirement benefits for themselves, rather than rely upon the benevolence of the union. Furthermore, the benefits at issue are status benefits, because they are provided when an employee achieves the status of retiree. Since retirees generally do not forego their retirement status, it is reasonable to infer that the benefits were meant to continue throughout the remainder of their lives. Nothing in the collective bargaining agreement rebuts the inference of vesting in any way.

Defendants provide no reason to believe that plaintiffs' retiree benefits had not contractually vested. Although the company argues that Mr. Gibney held a "good faith belief" that the retiree health benefits ended when the contract expired, they now concede that "their belief may well have been incorrect." Defendants' Response to Plaintiffs' Motion for Summary Judgment, Reply to Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, and Response to Plaintiffs' Motion to Compel, at 14. Thus, their position that they have no liability in this action to Archer and Maxim and the class which they hope to represent is not based upon a contention that the contract does not provide for vested benefits, but that these former employees entered into accords and satisfaction which extinguished their contractual rights. Since plaintiffs Thonen and Hannaman concededly did not enter into an accord and satisfaction, defendants argue that those plaintiffs have lost benefits which already had vested because they failed to make payments required by the contract. They rely upon Article XVI, § 3, which states in pertinent part:

Any pensioner who is enrolled under the Company's pensioner group insurance program shall monthly, on or before the last day of each month with respect to which he is so enrolled, make a pay-

ment to the Accounting Department in the full amount of the carrier's billing charge (said billing charge to be on the basis of a group constituted of all covered employees and pensioners of the Company but with an appropriate reduction to reflect the difference between the hospitalization insurance, surgical insurance, and out-patient X-ray and diagnostic laboratory benefits available under this Article XVI as compared with those furnished under the preceding Article XV) for the coverage for which the pensioner was enrolled for said month, and if, by the said last day of the month, the Accounting Department has not received such payment from the pensioner, the pensioner shall be disenrolled from all phases of the Company's pensioner group insurance program, said disenrollment to be effective as of the first day of the following month.

An examination of the complete text of Article XVI reveals that § 3's premium requirement does not apply to the plaintiffs or the proposed class. First, § 1 clearly applies to former employees who have already retired and to persons about to retire; it specifically exempts employees subject to § 4, or future retirees age sixty-two or over after May 7, 1979. Second, § 3 distinguishes its coverage from that provided to active employees under Article XV. Section 4, by contrast, states that retirees covered by its terms will be entitled to medical coverage in effect at the time of their retirement—*i.e.*, benefits set forth in Article XV. By the explicit language of Article XVI, §§ 1–3 and 4 cover two mutually exclusive groups of retirees. Thonen

and Hannaman both retired in 1982. Thonen affidavit, at 3; Hannaman affidavit, at 4. Since they clearly fall within the group of retirees whose benefits are created by § 4, Thonen and Hannaman were not required to make payments required by § 3.

In sum, the collective bargaining agreement, when evaluated on its face, unambiguously provides that retiree health benefits established by § 4 will continue beyond the expiration date of the contract over the lifetime of the retirees.[4] Defendants provide no basis for concluding otherwise, and they are mistaken in their argument that Thonen and Hannaman lost health benefits to which they would otherwise be entitled because they failed to pay premiums. The company's argument that they are not liable to Archer and Maxim and the class which they hope to represent depends upon whether they can demonstrate that each retiree except Thonen and Hannaman entered into a valid accord and satisfaction with the company.

### B. *ERISA*

Plaintiffs argue that the company acted as a fiduciary for the administration of the health benefit plan, thus subjecting itself to ERISA's "strict fiduciary duty" to act solely for the benefit of the participants. Evaluation of their argument requires a familiarity with the structure of the ERISA statute.

Title 29 U.S.C. § 1002 (1982) defines "employee welfare benefit plans"[5] and expressly distinguishes them from "employee pension benefit plans."[6] Both are deemed

---

**4.** Because the Court finds that the intentions of the parties are clear from the face of the collective bargaining agreement, it does not consider extrinsic evidence in reaching this holding. Defendants submit no extrinsic evidence tending to make the words of the contract ambiguous.

**5.** Title 29 U.S.C. § 1002(1) (1982) provides:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their

beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

**6.** Title 29 U.S.C. § 1002(2) (1982) provides:

The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter

to be "employee benefit plans" regulated by ERISA.[7] In the following section, however, the statute limits the scope of the restrictions imposed upon welfare benefit plans. Title 29 U.S.C. § 1003(a) (1982) states that ERISA governs employee benefit plans except as otherwise provided in, *inter alia*, §§ 1051 and 1081[8]; 29 U.S.C. §§ 1051(1) and 1081(a)(1), in turn, exempt employee welfare benefit plans from ERISA's stringent participation, vesting, and funding standards.[9]

■ Employee welfare benefit plans are not exempted from ERISA's standards governing fiduciary responsibility.[10] Thus, the company must abide by its fiduciary duties under ERISA if it is properly categorized as a fiduciary of its health benefits plan. Title 29 U.S.C. § 1002(21)(A) (1982) states:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

Plaintiffs assert that the company is a fiduciary of the health benefits plan because it exercised discretionary control over the management of the plan by acting to change the benefits. This Court rejects this argument, because the consequences of accepting it would be that every employer which ever terminated an employee benefit plan would at that time acquire a fiduciary duty under ERISA, even though it had previously designated another party to manage the plan and had exercised no discretionary functions. This Court cannot believe that this result was desired by Congress, since it permitted parties other than the employer to act as fiduciaries.

---

established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
(A) provides retirement income to employees, or
(B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

7. Title 29 U.S.C. § 1002(3) (1982) provides:
The term "employee benefit plan" or "plan" means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

8. Title 29 U.S.C. § 1003(a) (1982) states:
Except as provided in subsection (b) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained—
(1) by any employer engaged in commerce or in any industry or activity affecting interstate commerce; or
(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce, or
(3) by both.

9. Title 29 U.S.C. §§ 1051 and 1081(a) (1982) introduce Parts 2 and 3, respectively, of ERISA, which concern participation, vesting and funding requirements. They state in identical language:
This part shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title) other than—
(1) an employee welfare benefit plan;
      \*    \*    \*    \*    \*    \*

10. Title 29 U.S.C. § 1101 (1982) introduces Part 4 of ERISA, which establishes fiduciary duties. It states in pertinent part:
(a) This part shall apply to any employee benefit plan described in section 1003(a) of this title (and not exempted under section 1003(b) of this title), other than—
(1) a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees; or
(2) any agreement described in section 736 of Title 26, which provides payments to a retired partner or deceased partner or a deceased partner's successor in interest.

Plaintiffs' assertion that the company is a plan administrator is more persuasive. A plan sponsor is an administrator if another administrator is not designated.[11] In its supplemental brief, defendants admit that McNeil-Akron was the plan sponsor of the plan in issue and therefore also the administrator. Supplemental Brief of Defendants on the Issue of Whether the Company Breached a Fiduciary Duty to the Members of Plaintiffs' Class by Entering into an Accord and Satisfaction with Them, at 3. Moreover, they present evidence in the form of the affidavit of Raymond Keller which demonstrates that the company did exercise discretion in the administration of the plan. Thus, ERISA's definition of a fiduciary without doubt encompasses the company.

While the company virtually admits owing some fiduciary duty to the plaintiffs as plan administrator, it argues that this duty is restricted to its actual administrative functions, such as presenting claims to the insurer for payment and issuing checks. It claims that an employer is not precluded from negotiating about the health care benefits merely because it is the "plan administrator." Several appellate courts have held that an employer's renegotiation or amendment of employee benefit plans in which the benefits do not vest pursuant to ERISA is distinguishable from an employer's duties as an administrator of a plan, which is governed by ERISA's fiduciary standards. *Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1416–1417 (2d Cir.1985); *United Independent Flight Officers v. United Air Lines, Inc.,* 756 F.2d 1262, 1268 (7th Cir.1985); *Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406, 410–411 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

Plaintiffs anticipate the company's attempt to distinguish its "employer" function, which is somewhat adversary to the employees, from its "fiduciary" function as the plan administrator. They assert that the case at bar cannot be reconciled with cases which hold that a change in the level of benefits does not violate § 404 of ERISA, because their medical benefits were vested, citing *Yard-Man* and its Sixth Circuit progeny. Plaintiffs' Brief on Issue of Company as Fiduciary, at 3–4. However, the cases holding that there is no breach of fiduciary duty when benefits are renegotiated or amended draw an exception only for benefits vesting pursuant to ERISA, not benefits which are contractually vested. *See Sutton,* 724 F.2d at 410 (employer may change ancilliary benefits which do not vest under ERISA without violating its fiduciary responsibility; the right to the payment of these benefits is derived from pertinent employment agreements).

That the question of whether medical benefits must be maintained by an employer is answered by labor contracts rather than ERISA is demonstrated by *Viggiano v. Shenango China Division of Anchor Hocking,* 750 F.2d 276 (3d Cir.1984). The Third Circuit was presented with a dispute involving the termination of group hospital benefits for employees during a strike. The union contended that the termination was a violation of the company's fiduciary duties, while the employer maintained that the collective bargaining agreement permitted it to terminate benefits at the agreement's expiration. Although the court resolved the case by holding that the dispute was properly adjudicated through the grievance procedure rather than via immediate judicial remedies, it reached its result after determining whether ERISA or the labor contract provided the controlling principles. The court stated:

> As a preliminary observation, it is helpful to remember that ERISA's concern is

---

11. Title 29 U.S.C. § 1002(16)(A) (1982) provides:
    (16)(A) The term "administrator" means—
    (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
    (ii) if an administrator is not so designated, the plan sponsor; or
    (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

with the elements of a plan and its administration after it has been established rather than to mandate the creation of a program. ERISA does not require an employer to establish a hospitalization plan nor continue it indefinitely.

In *Sutton v. Weirton Steel Div. of National Steel Corp.* ..., the Court of Appeals held that an employer could terminate ancillary, nonvested benefits without violating ERISA. In refusing to continue payments, the employer did not breach any fiduciary duty, even though the company acted as administrator of its own pension plan. The court concluded that the provisions for benefits of this nature were to be found in the "pertinent employment agreements." *Id.* at 410. *See also* 1974 U.S.Code Cong. & Adm. News 4935, 5054.

Following that rationale, Shenango could bargain with the union to discontinue the hospitalization program in a forthcoming collective bargaining agreement without implicating ERISA's prohibitions....

\* \* \* \* \* \*

... Although the right to insurance benefits under the Plan is an essential part of this case, the immediate question is the source of the obligation to fund those entitlements. Unless the collective bargaining agreement establishes a duty to maintain the program, ERISA does not come into play.

*Id.* at 279–280 (citations omitted). As a result of its holding that the employer's duty to provide hospitalization benefits was established in the collective bargaining agreement, the court ordered that the district court stay adjudication of the union's ERISA claims until the threshold issue was decided in the grievance procedure. If arbitration established that the company had a continuing duty to provide benefits, the district court was directed to proceed on the merits of the ERISA claims. *Id.* at 281. The *Viggiano* decision delineates permissible employer conduct with respect to medical benefits from that which is a violation of the fiduciary duties created by ERISA. The right to receive such benefits

is created by labor agreements, and the employer is not prohibited from renegotiating them in order to discontinue or reduce the benefits. If the employer is contractually obligated to pay medical benefits, however, a unilateral discontinuance or reduction by the employer would violate its fiduciary duties. *See United Independent Flight Officers*, 756 F.2d at 1269 (no fiduciary duty breached by administrator by refusing to proffer distribution option until that option was included in the plan at the end of negotiations with union).

Although the case at bar is concededly different from the facts presented in the above-cited cases (as the facts in each of those cases are different from the facts in each of the other cases), the principles set forth in those cases control this Court. The Sixth Circuit has unequivocally rejected the argument that retiree welfare benefits are subject to mandatory vesting under ERISA, concluding instead that the parties can designate in their agreements whether these benefits will contractually vest. *White Farm*, 788 F.2d at 1193 (citing *Sutton*, 724 F.2d at 410–411, for the proposition that there is a "crucial difference under ERISA between retiree pension benefits and welfare benefits"). Plaintiffs do not dispute that holding, but rather argue that their medical benefits are contractually vested. As such, however, the medical benefits are subject to renegotiation by the company without implicating the company's fiduciary duties as plan administrator. Since an employer can negotiate directly with its retirees and without the participation of the union, *Yard-Man*, 716 F.2d at 1484, the company's conduct did not violate fiduciary standards if it can be characterized as negotiation, rather than a unilateral termination of the plaintiffs' benefits.

■ McNeil-Akron admits that it unilaterally terminated the health insurance coverage of Thonen and Hannaman. Answer of McNeil-Akron, Inc., at ¶¶ 32, 33. However, the company had procured the agreement of the other retirees to substituted performance before the coverage was changed to either the new plan or Plan C. Since it cannot be said that Archer, Maxim

and members of the proposed class insisted upon the medical benefits without premiums created by the collective bargaining agreement, their benefits were not unilaterally terminated.

Plaintiffs complain that the company's options which it proffered to the retirees did not include the option of retaining their benefits in their current form. They also seem to assert that the transaction was essentially a unilateral termination of the retirees' benefits, because of the thinly veiled threats of the company's pending bankruptcy and because of the individual retirees' unsophistication and lack of knowledge about their entitlement to their benefits as negotiated under the collective bargaining agreement. This hardline position by the company does not amount to a unilateral termination, but to a negotiating position. Archer, Maxim and the other retirees cannot maintain that their benefits have been unilaterally terminated when they have in fact agreed to accept something less. Although the company's conduct in negotiating the changes is shockingly aggressive in light of the retirees' relatively less powerful position, these factors are properly considered when evaluating whether the subsequent agreements between the company and each retiree should be invalidated under contract principles, rather than under the fiduciary standards of ERISA.

Accordingly, this Court holds that a continuing obligation to pay the plaintiffs' health benefits as negotiated in the collective bargaining agreements does not arise under § 404 of ERISA. Moreover, defendants are entitled to summary judgment against plaintiffs Archer, Maxim, and the potential class members, on their claim that the company violated its fiduciary duties as plan administrator under § 404. Summary judgment on the breach of fiduciary duties

pursuant to § 404 is entered in favor of Thonen and Hannaman.[12]

### V.

Defendants contend that their provision of alternative arrangements for the retirees which were accepted by everyone except Thonen and Hannaman constitute accords and satisfactions, and that the documents contained in their Exhibit C memorialize these agreements between the company and the individual retirees. Plaintiffs dispute that all of the legal elements of accord and satisfaction are present. They also proffer several equitable theories for repudiating these purported contracts: lack of consideration, misrepresentation, duress, undue influence, and unconscionability. This Court will begin its examination of the validity of these agreements by determining whether defendants' interaction with the retirees has resulted in an accord and satisfaction with each.[13]

### A.

It is settled law that the accord and satisfaction doctrine can be applied to disputes over retiree benefits and that individual retirees can compromise their claims for such benefits by settling with their former employers. *Yard-Man*, 716 F.2d at 1485. However, an accord and satisfaction between a retiree and a former employer over retiree benefits can be rejected by a court if the retiree has been a victim of overreaching. *Id.* at 1487. Again, the Court must be guided by "general common law principles, including the substantive law of the state in which the contract arose." *Id.* The application of the doctrine of accord and satisfaction in this case is not inconsistent with federal labor law. *Id.* at 1488.

In *Yard-Man*, the court of appeals applied Michigan law as well as principles set

---

**12.** Because the Court holds that the collective bargaining agreement created lifetime health benefits for the retirees and because no distinct remedy under ERISA is implicated, the Court does not consider plaintiffs' arguments with respect to ERISA reporting and disclosure requirements.

**13.** Plaintiffs also argue that an accord and satisfaction reached in this case should be set aside because of a breach of fiduciary duties under ERISA. This Court has already rejected the contention that defendants' conduct constituted a breach of fiduciary duty for retirees signing the agreements, and it will not examine this argument as a basis to set side settlements between the company and the retirees.

forth in contract treatises. Although Ohio law states the elements of accord and satisfaction differently, its essence is the same. The Ohio Supreme Court has stated, "Four elements must be present to have an accord and satisfaction: proper subject matter, competent parties, mutual assent, and consideration." *State ex. rel. Shady Acres Nursing Home v. Rhodes*, 7 Ohio St.3d 7, 8, 455 N.E.2d 489 (1983) (citing 1 Am.Jur.2d *Accord and Satisfaction* § 4). Settlement of a dispute will provide consideration if an "unliquidated demand" is extinguished. An "unliquidated demand" exists if there is a bona fide dispute as to its existence or amount. *Kirk Williams Co. v. Six Industries, Inc.*, 11 Ohio App.3d 152, 154, 463 N.E.2d 1266 (1983).

■ This Court finds that there was no consideration for the change in retiree benefits negotiated by the company. The company's position cannot be posited as an "unliquidated demand," because it had no rational basis whatsoever to believe that the retiree health benefits ended with the contract. Its investigation of the issue was limited to reading § 4 and ignoring its potential ambiguity. The company did not consult its attorneys to confirm its understanding of the collective bargaining agreement. While the record is clear that the company's attorneys were consulted regarding the package cost-cutting plan of which the change in retiree health benefits was a part, the content of the February 14th letter to the retirees, and the existence of a "side letter" to the labor contract on this issue, there is no indication that the attorneys were ever asked to determine the legal interpretation likely to be given to § 4. This state of affairs persisted after Gibney learned from MARC that some of the retirees believed that their collective bargaining agreements had guaranteed them vested retiree health benefits. Even accepting that Gibney and his staff had no idea that the contract might have created lifetime benefits before hearing that position asserted by MARC, Gibney must have realized sometime before negotiations with MARC were concluded that his initial interpretation of § 4 could be wrong and that there could be legal implications which required some investigation. Surely if Gibney reread § 4 after learning of the position of some of the retirees, he would have seen that the language of that provision, read without context, was ambiguous and could support the retirees' interpretation as well as his own. Yet he did not request legal research into the contract's interpretation—the most rudimentary of which should have uncovered the *Yard-Man* decision. Nor did he seek out anyone who had negotiated the contracts in 1979 and 1982, or otherwise attempt to find extrinsic evidence of the contracts' meaning. As this litigation has progressed, the company has abandoned its argument that the contract does not create vested retiree benefits, as it must in the face of the Sixth Circuit's precedent construing these contracts liberally in favor of vesting. Instead, it relies upon its "good faith belief" that the benefits were not vested. However, a party to a contract cannot create a bona fide dispute by steadfastly adhering to a legally untenable position just because it is unaware—or willing to remain uninformed—that its position is untenable.

Nor is there a bona fide dispute regarding the retirees' duty to pay premiums to continue health care coverage. Again, the company made no attempt to obtain a legal evaluation of its position. Furthermore, its construction of the contract is even more untenable with respect to this issue than to the vesting issue, since the contract facially distinguishes the benefits received by post–1979 retirees from those received by earlier retirees, who were required to purchase their own benefits. If defendants' argument that their "good faith belief" constituted a "bona fide dispute" were accepted, the latter concept would virtually be eviscerated, as stronger parties to a contract which desired to breach it could force the weaker parties into an accord and satisfaction by merely closing their eyes to the lack of legal support for their position. This Court cannot condone the creation of consideration out of thin air.

The only other source of consideration suggested by the defendants is that health benefits were increased by the change in

plans. This contention is directly contrary to the evidence presented in the summary judgment motions. In their depositions, Mr. Gibney and Mr. Keller were able to identify only two "improvements" in coverage: an increase in the age of eligible dependent children from age nineteen to age twenty-five (provided that the dependent was still in school), and an extension of benefits to surviving dependents after the death of the retiree. However, plaintiffs have produced a letter indicating that the extension of coverage to dependents up to age twenty-five in school occurred on July 19, 1983. In addition, the new plan clearly states that coverage for dependents ends at the time that the retiree's benefits are terminated, and the retiree's benefits are terminated at death.

In sum, the defendants have failed to demonstrate the existence of consideration, one of the necessary elements of an accord and satisfaction, because there was no bona fide dispute and because there was no increase in benefits created by the new plan. In addition, the Court finds that the mutual assent element is negated by the defendants' overreaching in this case. This discussion, however, is subsumed in the Court's discussion of unconscionability.

B.

▇▇ Plaintiffs also maintain that accords and satisfactions with the retirees should not be enforced because of the extraordinary overreaching of the defendants. An Ohio court recently stated the controlling standards to determine unconscionability:

A definition of unconscionability is often elusive. The Supreme Court has defined an unconscionable contract as one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other...." *Hume v. United States* (1889), 132 U.S. 406, 411 [10 S.Ct. 134, 136, 33 L.Ed 393]. In Ohio unconscionability has been described as "onerous, oppressive or one-sided, but that the terms bear no reasonable relation to the business risks...." *Central Ohio Co-Operative Milk Pro-*

*ducers, Inc. v. Rowland* (1972), Washington App., 29 Ohio App.2d 236, 281 N.E.2d 42.

*Polster v. Park View Federal Savings & Loan Association,* No. 49103 (Cuyahoga App. June 27, 1985) [Available on WESTLAW, OH–CS database] (available June 17, 1986 on LEXIS, States library, Ohio file) (citing *Women's Federal Savings and Loan Association v. Potz,* No. 46690 (Cuyahoga App. Nov. 17, 1983)). This Court finds that the agreements to accept lesser performance which the company procured from its retirees are unconscionable.

This transaction between the company and its retirees is characterized by little legal basis for the company's position and an untoward use of the company's negotiation power. As discussed above, the company's belief that it could unilaterally terminate the retiree health benefits has little basis in fact or law and is contradicted by the terms of the collective bargaining agreements, extrinsic evidence, and legal precedent. It is also clear that while the company was suffering from continued financial difficulties, the retirees' health benefits were only one of the costs which could be cut, and if left intact, were not by themselves costly enough to force the company into bankruptcy. Despite this, the company's February 14th letter clearly threatened that the company would go bankrupt if the health benefits were not reduced, and the retirees would be left with no protection. That letter also presented the change in benefits as a decision which had already been made. The retirees were limited to choosing the package which they deemed the least undesirable option.

Since the company did not receive much cooperation as a result of the February 14th letter, the negotiations with MARC began. During those negotiations, the company sent out the May 4th letter, indicating that each retiree would have to choose between two options being negotiated by other retirees. This letter relied upon the imprimatur of MARC, even though that organization could not legally bargain for retirees without their consent. The June 26th letter, which contained the

accord and satisfaction to be signed and returned, further implied that the benefit reduction was a *fait accompli*. Instead of explaining that their rights to the prior insurance program would be terminated by the signing of that document, the letter told the retirees that the agreement would "insure that you are apprised of its content and meaning," and that "[i]n order to maintain proper records for ourselves and the insurance company, we must ask that you sign one copy and return it to us within 15 calendar days." Although there is no question that the company intended to fully inform all retirees of the terms of the agreement, these documents are now asserted by the defendants as foreclosing liability to all retirees who signed them. Certainly this was not the purpose of the document which was communicated by the letter.

The record establishes without dispute that the company intended to reduce its costs for retiree health insurance regardless of whether some or all of the retirees would insist upon continuation of their current plan. The company had the ability to unilaterally reduce payments, even if that constituted a breach of contract. The retirees by definition could not respond to a breach by concerted action against the company. Even though this Court has held that each retiree was entitled to health benefits as the deferred compensation negotiated in 1979 and 1982, he or she would be required to individually bring a lawsuit to retain the benefits which had been collectively negotiated, as demonstrated by the fate of Thonen and Hannaman. Since the value of each claim is relatively small, an individual retiree would rationally decide that legal action would be too costly, and the alternative to choosing one of the options proffered by the company would be to have nothing. Since the company offered no consideration for the change in benefits, this Court would be remiss if it found that the company had not forced the majority of its retirees into a contract which is "onerous, oppressive and one-sided." The accords and satisfactions are unconscionable and will not be given effect by this Court.

## VI.

TO SUMMARIZE:

1. The collective bargaining agreements entered into by the union and the company in 1979 and 1982 provided for lifetime retiree health benefits. Since Thonen and Hannaman never entered into agreements to change their benefits, they are entitled to summary judgment on liability. Although Archer and Maxim signed documents designated as accords and satisfactions, these agreements are void, because they lack consideration and are unconscionable. Therefore, Archer and Maxim are also entitled to summary judgment on liability. The company is permanently enjoined from failing to provide the four plaintiffs with coverage under the health insurance plan in place in early 1984 and established pursuant to the collective bargaining agreements. Plaintiffs shall be immediately reinstated into the proper plan.

2. The company's conduct with respect to the unilateral termination of Thonen and Hannaman's benefits constitutes a breach of fiduciary duty under § 404 of ERISA, entitling Thonen and Hannaman to summary judgment on that issue. Since the company did not unilaterally terminate the benefits of Archer and Maxim, summary judgment is entered for the company on their § 404 claims.

Two issues remain in this litigation. First, this Court must determine whether the proposed class shall be certified. Both parties shall brief this issue within ten (10) days and supplement the record to the extent that they deem necessary for the Court to make the appropriate findings. A hearing on certification will be held at either party's request.

Second, the damages to be apportioned against each defendant must be determined. Obviously, the remedy cannot be fully decided until the Court had decided whether the proposed class will be certified. A status conference will be scheduled after the determination of class status is made in order to discuss appropriate

procedures with respect to the damages phase of this litigation.

IT IS SO ORDERED.